Rhea **DOPICO, et al.,**
**Plaintiffs-Appellants,**

v.

Neil E. **GOLDSCHMIDT, et al.,**
**Defendants-Appellees.**

**DISABLED IN ACTION, et al.,**
**Plaintiffs-Appellants,**

v.

Neil E. **GOLDSCHMIDT, et al.,**
**Defendants-Appellees.**

**No. 603, Docket 81–6172.**

United States Court of Appeals,
Second Circuit.

Argued March 11, 1982.

Decided Sept. 2, 1982.

Jane E. Bloom, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., and Richard N. Papper, Asst. U. S. Atty., New York City, on the brief), for federal defendants-appellees.

Dean Ringel, New York City (Floyd Abrams, Thomas Jones, Devereux Chatillon, and Cahill, Gordon & Reindel, New York City, on the brief), for local defendants-appellees.

Jane Greengold Stevens, Brooklyn, N. Y. (John C. Gray, Jr., George W. Sampson, and Brooklyn Legal Services Corp., Brooklyn, N. Y., Susan Sugar Nathan and Community Action for Legal Services, Inc., Handicapped Persons Legal Support Unit, New York City, Sutton Keany, Christopher R. Wall, Aileen Meyer, and Winthrop, Stimson, Putnam & Roberts, New York City, on the brief), for plaintiffs-appellants.

Before TIMBERS, NEWMAN and CARDAMONE, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal concerns the extent of the efforts that federal law requires of local and federal authorities in pursuing the national policy of making urban mass transportation available to the handicapped. Plaintiffs, individually and representing all wheelchair-bound handicapped persons in New York City, initiated two consolidated class actions in the District Court for the Southern District of New York against local and federal defendants, seeking declaratory and injunctive relief to force defendants to comply with a variety of federal statutes and regulations that implement that policy through a system of federal funding and administrative oversight. The principal local defendants are the New York City Transit Authority, the Metropolitan Transportation Authority, and the New York City Department of Transportation. The federal defendants are officials of the United States Department of Transportation (DOT) and its Urban Mass Transportation Administration (UMTA).

In essence, plaintiffs made two claims. First, they alleged that the local defendants, who are recipients of federal mass transit assistance funds granted by federal agencies, have failed during the past decade to use these funds to make the "special efforts" required by federal law toward making mass transportation services in New York City available to the elderly and the handicapped. Second, they alleged that the federal defendants, who grant such assistance on appropriate application and who must certify local program compliance with federal law, have continued to approve and fund the local defendants' programs even though the federal defendants knew or should have known of the lack of required "special efforts." On motion of defendants, the District Court (Edward Weinfeld, Judge) dismissed the complaint against the local defendants for failure to state a claim upon which relief could be granted, ruling that the statutes upon which the plaintiffs relied either did not create a private right of action or did not permit the kind of relief sought. The Court also granted summary judgment in favor of the federal defend-

ants, ruling that their decisions and actions passed muster under the "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1976). 518 F.Supp. 1161 (S.D.N.Y.1981). Plaintiffs appealed.

As to the dismissal of the complaint against the local defendants, we affirm several aspects of Judge Weinfeld's ruling, but disagree with his conclusion that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976), does not permit any of the relief that plaintiffs seek. As to the grant of summary judgment against the federal defendants, we conclude that such a judgment is premature because there is a factual question as to the completeness of the administrative record before the Court. We therefore reverse in part and remand for further proceedings.

*The Regulatory Scheme*

Federal aid to urban mass transit programs is provided primarily under sections 3 and 5 of the Urban Mass Transportation Act ("UMT Act"), 49 U.S.C. §§ 1602, 1604 (1976), and under the Federal-Aid Highway Act ("FAH Act"), 23 U.S.C. §§ 120(a), 142(a), (c) (1976). The UMT Act was enacted in 1964; in 1970 Congress added to it section 16, in response to complaints that the various facilities being subsidized were not accessible to people using wheelchairs. Section 16 declared as "national policy" that the elderly and handicapped have the "same right" as other persons to use mass transit and that "special efforts shall be made in the planning and design of mass transportation facilities and services" to ensure that usable mass transportation is available to them. 49 U.S.C. § 1612(a). Three years later, Congress enacted the Rehabilitation Act of 1973, which includes the authorization of programs to "study and develop solutions to existing . . . transportation barriers impeding handicapped individuals." Rehabilitation Act of 1973, § 2(11), 29 U.S.C. § 701(11) (1976). Specifically involved in this litigation is section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits recipients of federal funding from

excluding from participation in any program, denying the benefits of any program to, or discriminating against otherwise qualified handicapped individuals.[1] The FAH Act also was passed in 1973; section 165(b), as amended in 1975, declares that projects funded under the FAH Act must be planned, designed, constructed, and operated to allow effective use by the handicapped. 23 U.S.C. § 142 note. These enactments form the principal statutory bases for plaintiff's complaint.[2]

Beginning in 1976, the federal defendants began promulgating regulations to implement the directives of these three statutes with regard to use of mass transit programs by the handicapped. Two basic sets of regulations were issued, one in 1976 and the other in 1979. Plaintiffs allege violations of both. The first set was the "special efforts" regulations, appearing in 49 C.F.R. Parts 609 and 613 (1980), and incorporating provisions now appearing at 23 C.F.R. Part 450 (1981). The latter provisions require that a local planning authority annually prepare and submit to the UMTA for its approval a Transportation Improvement Program (TIP). All funded projects must be part of a TIP, the purposes of which include specifying the improvements to be pursued during the program period, setting priorities, and estimating expenses. Each TIP must contain an "annual element" list-

ing the projects to be implemented that year. The "special efforts" regulations added three new criteria to those governing the UMTA's approval of the TIP: (1) the planning process by which the TIP was developed had to show satisfactory "special efforts" in planning services and facilities that could be effectively used by the elderly and the handicapped, 23 C.F.R. § 450.-120(a)(5); 49 C.F.R. § 613.204(a), (2) the annual element of every TIP submitted after September 30, 1976, had to contain projects designed to benefit the handicapped, id. § 613.204(b), and (3) after September 30, 1977, funding recipients had to demonstrate reasonable progress in implementing previously programmed projects, id. § 613.204(c). The regulations did not specify a particular program design that would satisfy the "special efforts" requirement.[3]

The second set of regulations was issued in 1979 and appeared in 49 C.F.R. Part 27 (1980). These superseded the 1976 regulations, requiring far more than mere "special efforts." Instead of the relatively mild 1976 requirement that some progress be made, the 1979 regulations substituted a far more exacting scheme by establishing "accessibility" as a goal and by specifying the criteria for determining its achievement in various types of public transportation and

---

1. There is no question that mass transportation programs are "program[s] . . . receiving Federal financial assistance" and were intended by Congress to fall within the scope of section 504. *See* S.Rep.No.1297, 93d Cong., 2d Sess. 38, *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6388 ("Section 504 was enacted to prevent discrimination against all handicapped individuals . . . in relation to Federal assistance in . . . transportation . . . programs.").

2. Plaintiffs also claimed under section 315 of the Department of Transportation and Related Agencies Appropriations Act of 1975, Pub.L. No.93–391, § 315, 88 Stat. 768, 781 (1974), which conditioned availability of fiscal year 1975 funds for the purchase of subway cars and buses on their being designed to meet the needs of the elderly and the handicapped. That claim is not asserted as part of this appeal.

3. In general, "special efforts" means "genuine, good-faith progress in planning service for wheelchair users and semi-ambulatory handi-

capped persons that is reasonable by comparison with the service provided to the general public and that meets a significant fraction of the actual transportation needs of such persons within a reasonable time period." 23 C.F.R. Part 450, Subpart A, App. B. To provide more particular guidance, an advisory appendix to the 1976 regulations offered three examples of what would constitute adequate "special efforts": (1) spending an average of 5% of the local area's apportionment under section 5 of the UMT Act on a program for wheelchair users; (2) purchasing only wheelchair-accessible fixed-route buses until half of the fleet is accessible; or (3) introducing a paratransit system (non-fixed-route) to provide at least 10 round trips per week to each handicapped individual. 49 C.F.R. § 613.204 App. The appendix emphasizes that these are examples only, that they are "not regulatory standards or minimums," and that they do not exhaust the valid approaches. *Id.*

setting a timetable for accomplishing it.[4] The validity of this second set of regulations was placed in question, however, by the District of Columbia Circuit's decision in *American Public Transit Association v. Lewis* ("*APTA*"), 655 F.2d 1272 (D.C.Cir. 1981). That decision held that the new regulations were invalid to the extent that they were based on section 504, since they required extensive and costly modifications beyond that section's authority; the Court "remanded" the regulations to DOT to determine whether, in the absence of section 504, they could properly be based solely on the other statutes to which the regulations referred—section 16 of the UMT Act and section 165(b) of the FAH Act. As a result of the *APTA* case, DOT issued new regulations on July 21, 1981, superseding the 1979 set. *See* 46 Fed.Reg. 37,488 (1981). These are now codified at 49 C.F.R. § 27.77 (1981). They return essentially to the 1976 model, requiring "special efforts" toward providing transportation usable by the handicapped, rather than achieving a predefined goal of "accessibility" by a certain date.

### Plaintiffs' Claims

Plaintiffs allege violations of the three statutes, the 1976 and 1979 regulations, and the Fifth and Fourteenth Amendments. The District Court's opinion provides a thorough account of the factual allegations, which we will summarize here. Plaintiffs' charges pertain to the time period since 1976, when the first set of regulations appeared. Basically, plaintiffs assert the complete inadequacy of the "special efforts" that the local defendants made during that time. Their allegations focus on two main projects proposed in the TIPs for the years in question and intended to satisfy the "special efforts" requirement. The rest was a proposal for specially equipped minibuses; it was accepted by DOT as the "special efforts" for fiscal year 1977–78, but was never implemented. The minibus proposal

was replaced in 1980 by a proposal for full-size buses with wheelchair lifts; this amended proposal also has not been implemented. The second project called for a paratransit service system; it was accepted by DOT as the "special efforts" for, in turn, fiscal years 1978–79, 1979–80, and 1980–81, but also has not yet appeared. Plaintiffs claim that the projects were inadequately planned and, in any event, were never implemented, that the money allocated to them each year was neither spent for the designated projects nor set aside for future use, and that the federal defendants continued to provide funding despite these shortcomings. They requested various forms of declaratory and injunctive relief, including injunctions requiring the local defendants to comply with the "accessibility" mandate of the 1979 regulations and restraining the federal defendants from granting further funding in the meantime; they also requested the appointment of a special master to determine the amount of money not spent or misspent, to monitor implementation of required plans, and to recommend any necessary additional orders.

### The District Court's Decision

In a comprehensive opinion, the District Court dismissed all claims against the local transit defendants and entered summary judgment in favor of the federal defendants. As to the claim against the local defendants based on section 16 of the UMT Act, the Court ruled, after a careful review of the considerations enumerated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), that it would be inconsistent with the underlying purpose of the Act as a whole to find a private right of action implied under section 16. As to the claim under section 165(b) of the FAH Act, plaintiffs conceded that the section provided no right of action. The Court also concluded that 42 U.S.C. § 1983 did not authorize suit for violation of these provisions

---

**4.** These regulations were issued to conform DOT's regulations to guidelines issued by the Department of Health, Education, and Welfare. HEW had been directed by the President to coordinate government implementation of section 504 of the Rehabilitation Act and had decided to require "mainstreaming" of the handicapped with the rest of the public. In the context of public transportation, this meant that all modes of transportation had to be made accessible to the handicapped, not just that "special efforts" be made in that direction.

because neither section 16 nor section 165(b), each of them only one part of a complex funding statute, created substantive "rights" enforceable through section 1983. Nor, the Court held, had plaintiffs stated a valid equal protection claim under section 1983: measured by the appropriate test—rational relation—defendants' actions were constitutionally unobjectionable.

We affirm these aspects of the District Court's decision, substantially for the reasons elaborated in Judge Weinfeld's opinion. We therefore turn to the two areas where we disagree with the District Court's ruling: the dismissal of the claim against the local defendants under section 504 of the Rehabilitation Act, and the grant of summary judgment in favor of the federal defendants.

## I. The Section 504 Claim Against the Local Defendants

Section 504 provides that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1976). While conceding that current interpretations of section 504 hold that it supports a private right of action, *see, e.g., Baker v. Bell*, 630 F.2d 1046, 1055 (5th Cir. 1980); *Leary v. Crapsey*, 566 F.2d 863, 865 (2d Cir. 1977) (*per curiam*); *United Handicapped Federation v. Andre*, 558 F.2d 413, 415 (8th Cir. 1977); *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277, 1284–87 (7th Cir. 1977), defendants argued, and the District Court held, that section 504 does not permit the relief plaintiffs seek here.

Judge Weinfeld based his decision primarily on a consideration of two cases. In the first, *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court held that section 504 does not impose an "affirmative-action obligation" on a state educational institution, *id.* at 411, 99 S.Ct. at 2369, requiring it to make "substantial mod-

ifications in [its] programs," *id.* at 405, 99 S.Ct. at 2366, or to incur "undue financial and administrative burdens," *id.* at 412, 99 S.Ct. at 2370, in an effort to accommodate handicapped persons whose disabilities render them not "otherwise qualified" for such programs. The Court ruled against the plaintiff, who suffered from a severe hearing disability that prevented her from participating in the normal training for nurses, because enrolling her would have required a "fundamental alteration in the nature" of the defendant college's registered nursing program. *Id.* at 410, 99 S.Ct. at 2369. In the second case, *APTA, supra*, the District of Columbia Circuit applied *Davis* in the mass transportation context and held that the "extensive modifications of existing systems" required by the 1979 "accessibility" regulations, and the "extremely heavy financial burdens on local transit authorities" that implementing them would impose, were equivalent to the fundamental program alterations held in *Davis* to be beyond the scope of section 504. 655 F.2d at 1278. The Court therefore held that the 1979 regulations were an invalid implementation of that section.

In the present case, the District Court concluded that dismissal was warranted because the plaintiffs were seeking "massive relief involving extra-ordinary expenditures," 518 F.Supp. at 1175, which would amount to the " 'kind of burdensome modifications that the *Davis* Court held to be beyond the scope of section 504,' " *id.* at 1176 (quoting *APTA, supra*, 655 F.2d at 1278). The extreme result of dismissing the claim would be proper only if plaintiffs would not be entitled to any relief, even if they were to prevail on the merits. We do not believe that conclusion can be reached at this preliminary stage of the lawsuit. The complaint does not necessarily seek, nor would a remedy necessarily entail, either "massive relief" of the sort *APTA* feared would be required to achieve accessibility under the 1979 regulations, or "affirmative action" of the sort that *Davis* held was not required by section 504.

### A. *"Massive Relief"*

Judge Weinfeld summarized the central meaning of *Davis* for mass transportation programs to be that section 504 "does not require massive expenditures." 518 F.Supp. at 1176. He then concluded that granting relief for plaintiffs would necessarily entail such a remedy:

> Plaintiffs, if they were to prevail, would compel the local defendants to expend huge resources over the next several decades which would fundamentally alter many transportation services. There is no escaping the fact that plaintiffs in this law suit seek a major overhauling of the transit system in their purpose to compel implementation of programs for the handicapped.

*Ibid.* Even if that view characterizes what plaintiffs seek, it does not necessarily describe less ambitious relief to which they may be entitled.

In the first place, if plaintiffs can prove a violation of section 504, the District Court has inherent power to fashion relief appropriate to the situation. That power is not limited by the fact that plaintiffs may have asked for too much in seeking relief based on the 1979 regulations, *see* Fed.R.Civ.P. 54(c), particularly since other regulations offer guidance in developing a less ambitious solution. Moreover, unlike the Supreme Court in *Davis*, we are not faced with an all-or-nothing choice of remedies. In *Davis* nothing short of fundamental modifications in a professional training curriculum would accomplish the only relief that the plaintiff sought—admission to the nursing program. Here, by contrast, a whole range of prospective relief is imaginable to meet at least some of plaintiffs' concerns, should they be able to prove their allegations. If ordering relief based on the 1979 regulations would exceed the mandate of section 504, then more modest relief must be fashioned within the limits of *Davis.*

It is significant that plaintiffs are not seeking a remedy that would require federal, state, or local authorities to appropriate funds. The large federal subsidies to mass transit that the local defendants already enjoy, which cover from 50% to 85% of total project costs, *see* 23 U.S.C. § 120(a); 49 U.S.C. §§ 1603(a), 1604(e), are extended on the condition that some portion of the money be used for projects that benefit the handicapped. The 1976 "special efforts" regulations suggest, for example, that adequate efforts would consist of allocating an annual average of 5% of a locality's grant under section 5 of the UMT Act to projects for wheelchair users. 49 C.F.R. § 613.204 App. (1980). In 1980, that would have amounted to some $6 million of New York City's total federal capital and operating subsidy for mass transit of $490 million. While this is a considerable sum of money, it is not "massive" either in absolute terms or relative to the City's total receipt of mass transportation assistance, particularly since the very receipt of the money was conditioned on such an expenditure. Among plaintiffs' claims on the merits is that money designated for projects for the handicapped was misspent or not spent at all; if that occurred, it would hardly seem excessive to order that at least some of the money be spent as intended. Relief might also include the earmaking of subsequently appropriated mass transit funds for new projects to aid the handicapped, to whatever extent federal regulations require.

Judge Weinfeld's focus on the "massive" restructuring necessary to comply with the 1979 "accessibility" regulations obscures the fact that plaintiffs charged violations of the 1976 "special efforts" regulations as well. The latter requirements form a distinct basis for plaintiffs' complaint;[5] they also

---

**5.** Contrary to defendants' arguments, plaintiffs' private right of action under section 504 encompasses a right to allege violations of the 1976 "special efforts" regulations. Those regulations, like the 1979 set, rest on the authority of section 504, as well as on that of section 16 of the UMT Act and section 165(b) of the FAH

Act. *See* 41 Fed.Reg. 18,234 (1976); *American Public Transit Association v. Lewis*, 655 F.2d 1272, 1273 (D.C.Cir.1981). The fact that the latter two statutes do not provide plaintiffs with a private right of action does not affect the right provided by section 504, or impair the

stand as an independent source of legal obligation during the relevant time period, regardless of the validity of the more extensive 1979 requirements. The 1979 regulations were in force from 1979 to 1981, only the last two of the years covered by plaintiffs' complaint; there is no dispute that the 1976 regulations applied before that. In addition, the 1976 regulations remained in the Code of Federal Regulations throughout the brief life of the 1979 regulations. *See* 46 Fed.Reg. 17,488 (1981). The earlier requirements were eclipsed—superseded only in the sense of being rendered superfluous for the time being—but were not withdrawn or voided.

Moreover, since the two sets of regulations differ in important respects, the result in *APTA* does not impair the validity of a cause of action predicated on the 1976 regulations. While the 1979 regulations imposed a requirement that every existing mode of federally funded public mass transportation be made accessible to the handicapped, the 1976 regulations permitted the institution of separate transit services for such persons as an alternative to accessible bus and rail systems. As the *APTA* opinion noted, the 1976 regulations "allowed each local authority to choose a plan responsive to local needs. For example, a community could provide door-to-door 'special services,' rather than make fixed-route transportation modes accessible." 655 F.2d at 1275. To be sure, the "special efforts" regulations are subject to the same restriction that proved fatal to those issued in 1979: they may not require more than the statute authorizes. Unlike the ill-fated 1979 requirements, however, the "special efforts" regulations have never been questioned by a court as going beyond the substantive authorization of section 504. *Compare APTA v. Lewis, supra* (invalidating 1979 regulations as exceeding authority of section 504), *with Leary v. Crapsey, supra* (upholding right of action based on section 504 and 1976 regulations) (by implication), *United Handicapped Federation v. Andre, supra* (same), *and Lloyd v. Regional Transporta-*

*tion Authority, supra* (same). Even *APTA*, while attacking the 1979 requirements, seemed to regard the earlier regulations with approval.

In short, these plaintiffs do not necessarily seek the complete overhaul of the New York City transit system that the 1979 "accessibility" regulations seemed to contemplate. Even if they did, those regulations would not be the sole and unalterable measure of the possible relief for the wrongs they allege. While the 1979 regulations may be unenforceable after *APTA*, the fact that they exceeded the scope of section 504 as interpreted in *Davis* does not, as the District Court concluded, "appl[y] with equal force to the case at bar," 518 F.Supp. at 1175, and justify dismissing this complaint. *APTA* only sketches the outer limits in the mass transportation context of the limitations laid down by the Supreme Court in *Davis*. The key issue, therefore, is whether *Davis* not only proscribed forcing "massive" restructuring of transportation programs, but in fact prohibits *any* possible prospective relief in this setting.

### B. *"Affirmative Action"*

*Davis* concluded that Congress had understood "the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps," 442 U.S. at 410, 99 S.Ct. at 2369, and plainly had not intended "to impose an affirmative-action obligation on all recipients of federal funds" when it enacted section 504, *id.* at 411, 99 S.Ct. at 2369. The Court acknowledged, however, that the distinction is not always easily drawn: "It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program." *Id.* at 412, 99 S.Ct. at 2370. Similarly, *APTA* recognized that its holding that the 1979 regulations went beyond the scope of the statute would not necessarily apply to less extensive remedial measures. "[A]t some

consequent right of action based on its implementing regulations.

point a transit system's refusal to take modest, affirmative steps to accommodate handicapped persons might well·violate section 504." 655 F.2d at 1278.

■ We believe that section 504 does require at least "modest, affirmative steps" to accommodate the handicapped in public transportation. Every court that has considered the question has concluded as much. *See Leary v. Crapsey, supra; United Handicapped Federation v. Andre, supra; Lloyd v. Regional Transportation Authority, supra; Vanko v. Finley,* 440 F.Supp. 656 (N.D. Ohio 1977); *Bartels v. Biernat,* 427 F.Supp. 226 (E.D.Wis.1977). Even the *APTA* case, decided in the aftermath of *Davis,* acknowledged the need to take action. Moreover, it is difficult to imagine what Congress could have had in mind in including mass transportation within the sweep of section 504 and, more generally, in authorizing programs to "develop solutions to existing architectural and transportation barriers impeding handicapped individuals," 29 U.S.C. § 701(11), if not that some affirmative efforts must be undertaken.

■ *Davis*'s specific conclusion that section 504 imposes no "affirmative action" obligation in the area of requirements for admission to higher education programs is not to the contrary. As Judge Edwards, concurring in *APTA,* noted, *Davis*'s roots in the educational context limit the literal transferability of the rule:

> [T]he application of section 504 to public transportation systems raises some questions that are significantly different from those considered by the Supreme Court in the higher education setting in [*Davis*]. In considering the accessibility of public transportation to otherwise qualified handicapped persons, it is much more difficult to avoid "discrimination" without taking some kind of "affirmative action."

655 F.2d at 1281 (Edwards, J., concurring). In the context of public transportation and the handicapped, denial of access cannot be lessened simply by eliminating discriminatory selection criteria; because the barriers to equal participation are physical rather than abstract, some sort of action must be taken

to remove them, if only in the area of new construction or purchasing. As plaintiffs pointedly observe, "It is not enough to open the door for the handicapped . . .; a ramp must be built so the door can be reached." Brief for Appellants at 20–21.

In fact, the very use of the phrase "affirmative action" in this context is unfortunate, making it difficult to talk about any kind of affirmative efforts without importing the special legal and social connotations of that term. The vocabulary of remedies for past discrimination that require or at least set goals for hiring or enrollment of compensatory numbers of a disadvantaged class is inappropriate in a case of this sort. Here there is no program that "selects" participants. These plaintiffs do not, for example, demand that decisions selecting bus drivers or motormen from the pool of those qualified be weighted in favor of handicapped applicants. Here there is a public service that plaintiffs are entitled to use but that is not practically available to them.

*Davis* used the term "affirmative action" to refer to alteration of the standards or qualifications by which applicants to a program are selected, if those standards unfairly exclude a certain group. Even that use of the term is not in issue in this case. In *Davis,* a ruling in the plaintiff's favor would have required a change in the *nature of the program,* a reconstruction of the college's entire professional training process; in effect, it would have changed the accepted meaning of saying that a person had undergone training as a registered nurse. The central issue in *Davis,* to which questions of expenditures and effort were secondary, was whether "an educational institution [is required] to lower or to effect substantial modifications of [its] standards to accommodate a handicapped person," 442 U.S. at 413, 99 S.Ct. at 2370. The Court's decision that such changes were not required was virtually compelled by its earlier conclusion that the statutory phrase "otherwise qualified" means "one who is able to meet all of a program's requirements in spite of his handicap." 442 U.S. at 406, 99 S.Ct. at 2367. With the issue so defined, the only question was whether the ability to

hear spoken words was an integral requirement of the nursing program. Concluding that it was, the Court used the phrases "affirmative action" and "substantial modifications" in rejecting a requirement that the college must reconstitute its training program to render unnecessary a nursing student's ability to hear.[6]

Here, plaintiffs do not seek fundamental changes in the nature of a program by means of alterations in its standards. They do not, to adapt the example used above, demand that the physical qualifications for the job of bus driver or motorman be altered so that the handicapped are not excluded. The existing barriers to the "participation" of the wheelchair-bound are incidental to the design of facilities and the allocation of services, rather than being integral to the nature of public transportation itself, just as a flight of stairs is incidental to a law school's construction but has no bearing on the ability of an otherwise qualified handicapped student to study law.

The present controversy, then, is free of two of the more vexing public policy aspects of debates over affirmative action: the problem of reverse discrimination and the associated problem of changes in selection criteria necessary to widen the pool of "qualified" applicants. The issue here is purely economic and administrative—how much accommodation is called for by regulations implementing the Rehabilitation Act. This issue, though difficult, involves a set of questions different from those involved in "affirmative action" cases, for it turns more on considerations of practicality than on matters of entitlement, merit, and restitution. And while it is bounded, after *Davis*, by a general proscription against "massive" expenditures, the question is one of the degree of effort necessary rather than whether any effort at all is required. When Congress legislates to require accommodating federally funded mass transportation systems to the needs of the handicapped, and regulations specify that fund recipients must use their available funds to make some "special efforts" toward the national policy that Congress has established, courts are obliged to adjudicate claims that the law is not being observed. While we recognize that fashioning relief in this area will be difficult, that difficulty does not justify abandoning the task. We therefore reverse that part of the District Court's ruling that dismissed the complaint under section 504 of the Rehabilitation Act, and remand for consideration of the merits of plaintiffs' claims and for the fashioning of whatever appropriate relief to which they may be entitled.

## II. The A. P. A. Claim Against the Federal Defendants

The parties agree on appeal that the proper standard for evaluating the actions

---

6. By contrast, in cases where the relief requested did not modify some integral aspect of a defendant's program, courts have ruled that section 504 does require efforts to make the program available to otherwise qualified handicapped persons. *See, e.g., Tatro v. Texas*, 625 F.2d 557 (5th Cir. 1980) (catheterization for grade school student); *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980) (sign language interpreter for deaf graduate student), *vacated as moot*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). We recognize that the specific holdings of these cases may have to be reexamined in light of the Supreme Court's decision in *Board of Education v. Rowley*, —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), ruling that the Education for All Handicapped Children (EAHC) Act of 1975, 20 U.S.C. § 1401 *et seq.* (1976), did not require a local school district to provide a sign-language interpreter for a deaf child already receiving sufficient educational benefits. But we do not believe that *Rowley* impaired the principle of these cases that section 504 of the Rehabilitation Act requires some degree of positive effort to expand the availability of federally funded programs to handicapped persons otherwise qualified to benefit from them. First, the EAHC Act is not structured like the anti-discrimination provision of the Rehabilitation Act. Second, and more important, *Rowley* concluded that the specific relief that had been ordered exceeded the level of educational benefit already being provided to the plaintiff, a level that the Court concluded satisfied the statutory obligation. In this case, the plaintiffs have yet to be heard on their claim that the requirements of the Rehabilitation Act and its implementing regulations have not been met. It remains to be determined whether the efforts of the defendants have been deficient and, if so, whether some appropriate forms of relief are available.

of the federal defendants in continuing to fund the local defendants during the period covered by the complaint is whether those actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). In order to make the necessary determination of whether agency action was rational in the sense of being the result of reasoned decisionmaking—"whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)—a court must determine what facts were before the agency at the time it acted, *id.* at 420, 91 S.Ct. at 825, and whether the basis for the action is clearly set forth, *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

■ Determining what constitutes an agency's informational base is vital, for review must be based on the whole administrative record, *Citizens to Preserve Overton Park, supra*, 401 U.S. at 420, 91 S.Ct. at 825. Yet that determination may itself present a disputed issue of fact when there has been no formal administrative proceeding. *Hospital Association of New York State, Inc. v. Toia*, 473 F.Supp. 917, 927 (S.D.N.Y.1979). In the present case, the District Court acknowledged that such a dispute existed, for plaintiffs claimed that the record presented to the Court was not the full record that had been before the agency. 518 F.Supp. at 1180. Nevertheless, the Court proceeded to resolve that disputed factual issue on a motion for summary judgment, holding that "the administrative record now before the Court is that upon which the agency acted and is adequate to enable the Court to determine the path that the agency has followed in making its decisions and the basis on which those decisions were made." *Id.* at 1181.

We think that the District Court could not properly grant summary judgment when such a basic factual issue was in dispute, without at least permitting plaintiffs some limited discovery to explore whether some portions of the full record were not supplied to the Court. The Court's decision that the "contemporaneous documents" and "supporting memoranda" submitted by defendants were "adequate to enable the Court to perform its limited function to determine if the agency took all relevant considerations into account," *ibid.*, was therefore premature. Reasoned decisionmaking must be judged against the record *as a whole, see Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287, 291–92 (D.C.Cir.1975). The fact that defendants presented documents that seemed to support the rationality of their actions does not mean that the same conclusion would have been reached if the Court had been aware of other information that was before the agency. And defendants' assurances that they have submitted the full record will not substitute for the Court's independent consideration of that issue after some opportunity for discovery. This is particularly true in a case like this, where there is a strong suggestion that the record before the Court was not complete: conspicuously absent were the TIPs themselves for the relevant years. It is almost inconceivable that such fundamental documents—the very basis for federal decision-making about mass transit grants—would not have been part of the administrative record. We therefore remand this portion of the case to the District Court for further consideration of the A. P. A. claim following appropriate discovery as to the completeness of the administrative record.

*Conclusion*

The judgment of the District Court is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

CARDAMONE, Circuit Judge (concurring in part and dissenting in part).

I concur with my colleagues in affirming the District Court's holding as to the local defendants—that plaintiffs had no private right of action under section 16 of the UMT Act, and that the plaintiffs did not state a

claim under either 42 U.S.C. § 1983 or the equal protection clause via section 1983.

I respectfully dissent, however, from the majority in its reversal of the District Court's grant of summary judgment for the federal defendants. I would hold, for essentially the same reasons stated by Judge Weinfeld, that the record before both this Court and the District Court was the full administrative record upon which the federal agencies acted and was an adequate one for the District Court to determine whether the federal defendants had acted in a manner consistent with the mandate of the Administrative Procedure Act.

Thus, I would retain the findings made by the District Court as to the rational basis for the federal defendants' actions in continuing to fund the local defendants. The District Court's findings on the issue of whether the federal defendants acted in an arbitrary and capricious manner contain an analysis of the good-faith efforts of the local defendants, one of the indicia used by the federal defendants in deciding whether to continue funding. The federal defendants decided, and the District Court agreed, that the local defendants had taken steps to provide better mass transportation services to the handicapped ("special efforts"). While I too read section 504 of the Rehabilitation Act as requiring that at least "modest, affirmative steps" be taken, the District Court had already received evidence on this subject. Support can be found in the record to conclude that the local defendants had made a good faith attempt in the area of special efforts.[1] Further, included in the record is the fact that Judge Weinfeld took judicial notice of the local defendants' purchase of Grumman buses specially equipped for the handicapped. Nonetheless, the issue of summary judgment in the suit between the plaintiffs and the local defendants was not raised below, either by the parties or by the Court *sua sponte.* Hence, I must agree with the majority's reversal of the dismissal of the section 504 claim, but do so for procedural rather than substantive reasons.

1. Many of these affirmative acts failed for rea-

sons beyond the control of the local defendants.