**RSR CORPORATION and Revere Smelting & Refining Corporation, Plaintiffs,**

v.

**Carol BROWNER, as Administrator of the United States Environmental Protection Agency, Defendant.**

**No. 95 Civ. 0354.**

United States District Court, S.D. New York.

April 30, 1996.

Bickel & Brewer by William A. Brewer, III, Charles H. Steen, New York City, and Whiteman, Osterman & Hanna by Philip H. Gitlin, Albany, New York, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York by Jeffrey Oestericher, Assistant United States Attorney, New York City, for Defendant Carol Browner.

### OPINION

CHIN, District Judge.

Plaintiffs RSR Corporation ("RSR") and Revere Smelting & Refining Corporation ("Revere") (collectively, "plaintiffs") bring this "reverse-Freedom of Information Act" case to enjoin the Environmental Protection Agency (the "EPA") from disclosing certain information submitted to the EPA pursuant to the Clean Water Act and regulations promulgated thereunder. Plaintiffs appeal from a final determination of the EPA's Regional Counsel that Revere's average monthly production data must be made available to the public. Defendant Carol Browner, Administrator of the EPA, moves to dismiss the complaint, or, in the alternative, for summary judgment based on the administrative record. For the reasons set forth below, the defendant's motion for summary judgment is granted and the EPA's determination is affirmed.[1]

### BACKGROUND

Revere, a subsidiary of RSR, operates a secondary lead smelting plant in Wallkill, New York (the "Wallkill Plant"). In the course of its lead smelting operations, the Wallkill Plant generates industrial wastewater, which is treated at a facility located on-site. After this initial treatment, the water enters the public sewer system and is conveyed to a publicly-owned treatment works ("POTW") owned and operated by the Town of Wallkill (the "Wallkill POTW"). At the Wallkill POTW, Revere's pre-treated wastewater is mixed with other wastewater and, after additional treatment, is discharged into the Wallkill River.

### 1. Regulatory Framework

The Clean Water Act (the "CWA"), 33 U.S.C. § 1251 et seq., prohibits the discharge of pollutants except in accordance with standards established pursuant to the CWA. See 33 U.S.C. § 1311(a). Pursuant to 33 U.S.C. § 1317(b), the Administrator of the EPA has promulgated regulations establishing limits on the amount of pollutants that may be present in industrial wastewater discharged into a POTW ("pretreatment standards"). The pretreatment standards applicable to secondary lead smelters, expressed in pounds of pollutant allowed per million pounds of lead produced from smelting, are contained in 40 C.F.R. § 421.135(b).

The CWA and the regulations also contain reporting requirements to assist the EPA in monitoring compliance with the pretreatment standards. See 33 U.S.C. § 1318(a); 40 C.F.R. § 403.12(e). Industrial users that are subject to pretreatment standards, such as the Wallkill Plant, must provide semi-annual reports containing information regarding the nature and concentration of pollutants in the user's wastewater. See 40 C.F.R. § 403.12(e)(1). For industrial users whose pretreatment standards are expressed in terms of the amount of pollutant allowed per unit of production, the semi-annual report is to contain the user's actual average production rate for the reporting period. 40 C.F.R. § 403.12(e)(3). In accordance with these regulations, Revere submitted semi-annual compliance reports containing data on the Wallkill Plant's monthly production rate, which Revere designated as confidential.

### 2. Prior Proceedings

On March 2, 1994, the EPA received a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, from Carpenter Environmental Associates, Inc. ("Carpenter"). In its FOIA request, Carpenter sought records concerning the Wallkill Plant's compliance with the CWA, including the semi-annual compliance reports.

---

**1.** Defendant also seeks an order staying discovery; as defendant's motion for summary judg-

ment is granted, however, the motion to stay discovery is moot.

In a letter dated March 29, 1994, the EPA initially denied Carpenter's request on the grounds that the records requested might contain trade secrets or confidential business information exempt from FOIA's disclosure requirements. The EPA sent RSR a letter on March 31, 1994 notifying it of the FOIA request and giving RSR an opportunity to substantiate its claim of business confidentiality. On April 22, 1994 Revere's counsel responded to the EPA's notification, stating that Revere's production data should be exempt from disclosure due to its proprietary nature and because release of that data could harm RSR's competitive position in the secondary lead smelting industry. Specifically, Revere asserted that making its monthly production data available to competitors would reveal Revere's decision-making strategies regarding production.

In a final determination issued by the EPA's Regional Counsel pursuant to 40 C.F.R. § 2.205, the EPA rejected plaintiffs' claim that the records sought by Carpenter were exempt from disclosure under exemption 4 of FOIA, 5 U.S.C. § 552(b)(4), concluding that the Wallkill Plant's monthly production data was "effluent data," which is not eligible for confidential treatment. The Regional Counsel stated that effluent data is defined as "information necessary to determine the amount of pollutants which, under an applicable standard or limitation, the source was authorized to discharge (including, to the extent necessary for such purpose, a description of the manner or rate of operation of the source)." Murphy Decl.Exh.F. at 2. In concluding that the Wallkill Plant's production data was effluent data, the EPA's Regional Counsel considered the pretreatment standards applicable to the Wallkill Plant, and noted that the standards applicable to a secondary lead smelter are expressed in terms of allowable discharge per unit of production or operation. The Regional Counsel reasoned that "[i]n order to establish the allowable Standards for this type of facility, average production/operation data must be provided. Accordingly, one must know the facility's average production/operation rates to determine if the facility is in compliance with the applicable Pretreatment Standards." See Murphy Decl.Exh.F at 2.

Reasoning that "[t]he production data at issue here is necessary to determine the allowable Pretreatment Standards for this facility and, hence, the facility's compliance with an applicable Clean Water Act standard," id., the Regional Counsel concluded that the Wallkill Plant's monthly production rate constituted effluent data which is not entitled to confidential treatment and may not be withheld by the agency under FOIA exemption 4.

On January 18, 1995, plaintiffs filed this action seeking judicial review of the Regional Counsel's determination as well as preliminary and permanent injunctions prohibiting disclosure of the Wallkill Plant's production rate data. It appears that the EPA has stayed disclosure of the data pending resolution of this action.

## DISCUSSION

The government moves to dismiss the complaint, or, in the alternative, for summary judgment based on the administrative record. Because the defendant has submitted material outside the pleadings, namely, the administrative record, I will treat the motion as one for summary judgment. See Fed.R.Civ.P. 12(b).

### 1. Review of Agency's Determination to Disclose Information Under FOIA

FOIA imposes a general obligation on administrative agencies to make information available to the public, subject to exemptions pertaining to, *inter alia,* trade secrets and confidential commercial information. See 5 U.S.C. § 552(a) & (b)(4); *Chrysler Corp. v. Brown,* 441 U.S. 281, 292, 99 S.Ct. 1705, 1712–13, 60 L.Ed.2d 208 (1979). In *Chrysler,* a "reverse-FOIA" case, the Supreme Court held that FOIA's exemptions do not prohibit an agency from disclosing the requested information, but merely set forth instances in which the agency is not subject to FOIA's disclosure obligations. 441 U.S. at 292–94, 99 S.Ct. at 1712–14. Thus, where the requested information falls within an exemption to FOIA, the agency is not required to disclose the information, but may withhold it, in the agency's discretion. See *Chrysler,* 441 U.S. at 293–94, 99 S.Ct. at 1713–14.

■ Accordingly, FOIA itself does not provide a cause of action to a party seeking to enjoin an agency's disclosure of information, even if the information requested falls within one of FOIA's exemptions. *Chrysler*, 441 U.S. at 293, 99 S.Ct. at 1713 ("[T]he FOIA by itself protects the submitters' interest in confidentiality only to the extent that this interest is endorsed by the agency collecting the information."). The remedy available to a party seeking to prevent such disclosure is to appeal the agency's decision under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 500 *et seq. Chrysler*, 441 U.S. at 317, 99 S.Ct. at 1725.

### 2. *Standard of Review under the APA*

■ Under the APA, the district court shall set aside agency determinations that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that are "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F). Contrary to plaintiffs' assertions, a plaintiff in a reverse-FOIA action is not ordinarily entitled to de novo review. *See Chrysler*, 441 U.S. at 318, 99 S.Ct. at 1725–26. Rather, the district court will conduct a de novo review of an agency's decision to release information under FOIA only if the agency's determination is adjudicatory in nature and the fact-finding procedures employed were inadequate. *Acumenics Research & Technology v. United States Dep't of Justice*, 843 F.2d 800, 804 (4th Cir.1988) (*citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136); *see Camp v. F.W. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106.

■ An agency's decision to disclose information requested under FOIA is adjudicatory in nature. *See Pacific Architects and Eng'rs Inc. v. United States Dep't of State*, 906 F.2d 1345, 1348 (9th Cir.1990) (*citing Acumenics*, 843 F.2d at 804). Thus, if the fact-finding procedures employed by the agency were inadequate, the district court is to conduct a de novo review. If the fact-finding procedures were adequate, the district court is to review the agency's decision under the standard set forth in 5 U.S.C. § 706(2)(A). *See Pacific Architects*, 906 F.2d at 1348; *Acumenics*, 843 F.2d at 804–05.

■ Given the nature of the issues before the EPA, which involved mixed questions of law and fact, and the undisputed facts in this case, I find that the EPA's fact-finding procedures were adequate. The EPA promptly notified plaintiffs of Carpenter's FOIA request as required by the applicable CWA regulation, 40 C.F.R. § 2.204. *See* Murphy Decl.Exh.D. The EPA initially denied Carpenter's FOIA request so that it could consider whether the records, some of which Revere had designated as confidential, contained trade secrets or other confidential business information. Murphy Decl.Exh.D. Plaintiffs were given an opportunity to object to disclosure of the Wallkill Plant's production rate data and to substantiate their objections before the EPA made its final determination regarding disclosure. Murphy Decl. Exh.D. Plaintiffs' counsel submitted a response claiming that release of the production data would harm Revere competitively, which the Regional Counsel referred to in his final determination. *See* Murphy Decl. Exhs.E, F. Considering the actions taken by the EPA in making its determination, and the nature of the issues presented, I conclude that the fact-finding procedures used by the EPA were adequate. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) ("[A] formal hearing before the agency is in no way necessary to the compilation of an agency record."); *Pacific Architects*, 906 F.2d at 1348. Accordingly, de novo review is not required and the EPA's final determination should only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2]

**2.** Plaintiffs also argue that summary judgment is premature because they have not yet taken discovery. This argument is rejected. Plaintiffs do not allege that the administrative record before me is incomplete in the sense that any part of the record presented to the EPA's Regional Counsel has not been put before me. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971); *Dopico v. Goldschmidt*, 687 F.2d 644,

### 3. *Review under 5 U.S.C. § 706(2)(A)*

#### a. *Arbitrary, Capricious, or Abuse of Discretion*

■ In determining whether the agency's decision was arbitrary, capricious, or an abuse of discretion, the reviewing court is to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24 (citation omitted). Although "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency[,] ... the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citation omitted); *see Bersani v. United States Envtl. Protection Agency,* 850 F.2d 36, 46 (2d Cir.1988), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989).

The arguments plaintiffs present in challenging the EPA's determination are twofold: (i) the EPA failed to demonstrate that the production rate data is effluent data ineligible for confidential treatment and (ii) the regulation and statute providing that effluent data is not eligible for confidential treatment do not apply to the Wallkill Plant because the Wallkill Plant is not a "point source."

#### i. *Effluent Data*

■ Upon reviewing the regulations, the Regional Counsel's final determination, and the undisputed facts, I find that the EPA's decision that the Wallkill Plant's monthly production rate constitutes effluent data was reasonable, and therefore was not arbitrary, capricious, or otherwise an abuse of discretion.

As explained by the EPA's Regional Counsel, the regulations define effluent data to include

Information necessary to determine the identity, amount, frequency, concentration, temperature, or other characteristics (to the extent related to water quality) of the pollutants which, under an applicable standard or limitation, the source was authorized to discharge (including, to the extent necessary for such purpose, *a description of the manner or rate of operation of the source* ) . . . .

40 C.F.R. § 2.302(a)(2)(i)(B) (emphasis added). The Regional Counsel determined that, because the pretreatment standard applicable to the Wallkill Plant is expressed in terms of the allowable level of pollutant per unit of production, *see* 40 C.F.R. § 421.135(b), the Wallkill Plant's production rate was necessary to determine its compliance with the CWA. As the regulation setting forth the permissible level of pollutants applicable to the Wallkill Plant expresses the limit in terms of pounds of pollutant per million pounds of lead produced from smelting, *see* 40 C.F.R. § 421.135(b), it was reasonable for the EPA to conclude that the production rate data was "necessary" to determine the amount of pollutants that the Wallkill Plant was authorized to discharge.

■ Raising an argument based largely on semantics, plaintiffs also assert that the Regional Counsel erred in failing to consider whether the EPA *actually used* the Wallkill Plant's monthly production data to determine its compliance with the CWA. This argument is rejected. First, the EPA Regional Counsel stated in his decision that "[t]he production data at issue here is necessary to determine the allowable Pretreatment Standards for this facility." Implicit in that statement was a representation that the data was used—to determine the allowable standards. *See* Gov't Reply Mem. at 10. Second, in any event, the regulation defining effluent data does not require that the information must actually have been used to determine compliance; it simply provides that such information must be "necessary" to de-

654 (2d Cir.1982). As my review of the EPA's action is limited to the administrative record, discovery is not appropriate. *New York Dep't of Social Servs. v. Sullivan,* 811 F.Supp. 964, 977 n. 18 (S.D.N.Y.1993), *aff'd,* 21 F.3d 485 (2d Cir.

1994); *see Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *La Plaza Defense League v. Kemp,* 742 F.Supp. 792, 799 (S.D.N.Y.1990).

termine factors relating to compliance. *See* 40 C.F.R. § 2.302(a)(2)(i)(B). Accordingly, I find that the Regional Counsel's failure to explicitly state that the EPA actually used the production rate data to determine the Wallkill Plant's compliance with the CWA is of no moment.

#### ii. *Point Source*

■ Although the issue was not raised by plaintiffs in objecting to the FOIA request, plaintiffs claim that the EPA's decision should be set aside because the Wallkill Plant is not a "point source" that is subject to the CWA's reporting and disclosure requirements. *See* 33 U.S.C. § 1318(a)(A); 40 C.F.R. § 2.302(b).

Under the CWA, "[t]he term 'point source' means any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The terms "discharge of a pollutant" or "discharge of pollutants" mean "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12), and the term "navigable waters" is defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Plaintiffs claim that, as the wastewater generated by the Wallkill Plant is treated at a POTW before it is discharged into the Wallkill River, the Wallkill Plant is not a point source because it does not discharge pollutants directly into navigable waters. This argument is rejected, for three reasons. First, the plain language of the CWA suggests that a facility that discharges wastewater to a POTW is a point source. The section that establishes the CWA's reporting requirements provides that "the Administrator shall require the owner or operator of any point source to," *inter alia*, maintain records to assist in developing and determining compliance with pretreatment standards. 33 U.S.C. § 1318(a)(A). As pretreatment standards apply only to those facilities that discharge wastewater into POTWs, it follows that such facilities are point sources.

Second, courts have found that the term "point source" encompasses facilities whose wastewater is conveyed to a POTW before it is discharged into navigable waters. *See,*

*e.g., United States Envtl. Protection Agency v. Green Forest, Arkansas,* 921 F.2d 1394, 1398 (8th Cir.1990) (discussing three different types of point sources, including "indirect dischargers," or "sources that discharge their pollutants not into navigable waters but into the POTWs") (citation omitted), *cert. denied sub nom. Work v. Tyson Foods, Inc.,* 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991); *United States v. Velsicol Chem. Corp.,* 438 F.Supp. 945, 946–47 (W.D.Tenn. 1976). *But see Connecticut Fund for the Env't, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1417–18 (D.Conn.1987) (holding that indirect discharger did not violate the Federal Water Pollution Control Act by discharging pollutants into POTW rather than directly into navigable waters).

Finally, in light of the remedial purposes of the CWA, it is reasonable to conclude that facilities that discharge pollutants into POTWs, which in turn discharge the pollutants into navigable waters, are point sources. *Cf. Dague v. Burlington,* 935 F.2d 1343, 1354 (2d Cir.1991) (noting that "[t]he definition of a point source is to be broadly interpreted."), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). As it is undisputed that the Wallkill Plant discharges its wastewater into the Wallkill POTW, which in turn discharges the wastewater into the Wallkill River, the Wallkill Plant is a point source subject to the CWA's disclosure requirements.

#### b. *Not in Accordance With Law*

■ A district court reviewing an agency's decision to disclose information under FOIA shall also set aside the decision if it is "not in accordance with law." 5 U.S.C. § 706(2)(A). In *Chrysler,* the Supreme Court held that disclosure of information in violation of the Trade Secrets Act, 18 U.S.C. § 1905, is "not in accordance with law" under 5 U.S.C. § 706(2)(A). 441 U.S. at 318, 99 S.Ct. at 1726; *see McDonnell Douglas Corp. v. Widnall,* 57 F.3d 1162, 1164 (D.C.Cir. 1995). The Trade Secrets Act prohibits United States officers or employees from disclosing, *inter alia,* trade secrets "to any extent not authorized by law." 18 U.S.C. § 1905; *see Chrysler,* 441 U.S. at 295, 99

S.Ct. at 1714. Here, plaintiffs claim that disclosure of the Wallkill Plant's production rates would violate the Trade Secrets Act, but nowhere do plaintiffs argue that the planned disclosure is "not authorized by law," as is required to state a violation of the Trade Secrets Act. *See* 18 U.S.C. § 1905. In fact, it is clear that the disclosure approved of by the EPA is authorized by law, as both the CWA and the regulations promulgated under it permit disclosure of so-called "effluent data." *See* 33 U.S.C. § 1318(b);[3] 40 C.F.R. § 2.302(e) ("[I]nformation which is effluent data ... is not eligible for confidential treatment" under 40 C.F.R. § 2.208). Therefore, the EPA's decision is in accordance with law.

#### 4. *Information Voluntarily Submitted to the EPA*

 Finally, in their complaint and Memorandum of Law plaintiffs state that the monthly production rate information was provided to the EPA voluntarily, as the regulations only require that plaintiffs submit semi-annual data. Information that is voluntarily submitted is eligible for confidential treatment under the CWA regulations. 40 C.F.R. § 2.302(e); *see* 40 C.F.R. § 2.201(i) (defining term "voluntarily submitted information"). Plaintiffs are not entitled to review of this argument on this appeal, however, as they did not raise the issue before the EPA. *See Railway Labor Executives' Ass'n v. United States*, 791 F.2d 994, 1000 (2d Cir.1986) (Second Circuit has "declined to review arguments not raised before an administrative agency, absent exceptional circumstances") (citation omitted); *Kendrick v. Sullivan*, 784 F.Supp. 94, 99 (S.D.N.Y.1992).

Moreover, it does not appear that plaintiffs submitted the information voluntarily, as they provided the monthly produc-

tion rate data to the EPA as part of the semi-annual report required under 40 C.F.R. § 403.12(e). The record shows that plaintiffs submitted only monthly data; they did not provide the EPA with the required six-month production averages. *See* Murphy Decl. Exh.A. As plaintiffs elected to provide monthly figures to satisfy their semi-annual reporting requirements, it cannot be said that the information was submitted voluntarily.

### *CONCLUSION*

Upon reviewing the Regional Counsel's final determination and the administrative record, I find that the EPA's decision that the Wallkill Plant's monthly production data should be released was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the Clerk of the Court shall enter judgment affirming the decision of the EPA and dismissing the complaint with prejudice.

SO ORDERED.

---

**3.** Section 310 of the Clean Water Act provides that:

Any records, reports, or information obtained under this section (1) shall, in the case of effluent data, be related to any applicable effluent limitations, toxic, pretreatment, or new source performance standards, and (2) shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or informa-

tion, or particular part thereof (*other than effluent data*), to which the Administrator has access under this section, if made public would divulge methods or processes entitled to protection as trade secrets of such person, the Administrator shall consider such record, report, or information, or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18.

33 U.S.C. § 1318(b) (emphasis added).