AMERICAN PUBLIC TRANSIT ASSO-
CIATION, et al., Appellants,

v.

Andrew L. LEWIS, Jr., Secretary, United
States Department of
Transportation, et al.

No. 80–1497.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 1981.

Decided May 26, 1981.

Barry J. Cutler, Washington, D. C., for appellants.

Barry L. Gordon, Atty., Dept. of Justice, for appellees. Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Anthony Steinmeyer and Margaret E. Clark, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellees. Mary A. McReynolds, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellees.

Before MacKINNON, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion filed by Circuit Judge HARRY T. EDWARDS, concurring in the result.

MIKVA, Circuit Judge:

Petitioners challenge certain regulations promulgated by the Department of Transportation (DOT or Department) on May 31, 1979, to implement section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794 (Supp. III 1979), section 16 of the Urban Mass Transit Act of 1964 (UMTA), 49 U.S.C. § 1612 (1976), and section 165(b) of the Federal-Aid Highway Act of 1973 (FAHA), 23 U.S.C. § 142 note (1976). These regulations require that every mode of transportation in a mass transit system be made accessible to the handicapped, though waivers can be obtained for rail systems under some circumstances. *See* 44 Fed.Reg. 31,442, 31,477–81 (1979), 49 C.F.R. §§ 27.81–27.107 (1980).

The district court upheld the regulations as a valid exercise of DOT's statutory authority. Although it is possible that the UMTA or the FAHA might support the issuance of such regulations, we find that DOT's view of section 504 of the Rehabilitation Act is inconsistent with the Supreme Court's subsequent analysis of the Act in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Because we conclude from the administrative record that DOT relied primarily on its understanding of its responsibilities under the Rehabilitation Act in promulgating the regulations, we reverse and remand for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

A. *Events Leading to the Adoption of the 1979 Regulations*

The regulations challenged in this appeal are not the first DOT regulations dealing with mass transit systems and the handicapped. In 1976, DOT issued regulations designed to implement section 504 of the Rehabilitation Act, section 16 of the UMTA, and section 165(b) of the FAHA. *See* 41 Fed.Reg. 18,234 (1976). Each of these statutes deals with the handicapped. Section 504 provides that any program receiving federal funds must not discriminate against the handicapped.[1] Section 16 of the UMTA

---

1. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Supp. III 1979), states in its entirety:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the

provides that, as a matter of national policy, handicapped and elderly persons have the same rights as others to use mass transit facilities. This provision imposes an obligation on local planners to make "special efforts ... in the planning and design of mass transportation facilities and services so that the availability" of such services to the elderly and the handicapped will be "assured."[2] FAHA section 165(b) authorizes the Secretary of DOT to require that a mass transit system, aided by grants from highway funds under the FAHA, "be planned, designed, constructed, and operated to allow effective utilization by elderly or handicapped persons."[3]

The 1976 DOT regulations implemented these provisions by mandating that state and local planners make "special efforts in planning public mass transportation facilities and services that can effectively be utilized by elderly and handicapped persons." 41 Fed.Reg. 18,234 (1976). Approval of project grants was conditioned on

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

2. Section 16 of the UMTA, 49 U.S.C. § 1612 (1976), states in its entirety:

(a) It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this Act) should contain provisions implementing this policy.

(b) In addition to the grants and loans otherwise provided for under this Act, the Secretary is authorized to make grants and loans—

(1) to States and local public bodies and agencies thereof for the specific purpose of assisting them in providing mass transportation services which are planned, designed, and carried out so as to meet the special needs of elderly and handicapped persons, with such grants and loans being subject to all of the terms, conditions, requirements, and provisions applicable to grants and loans made under section 3(a) and being considered for the purposes of all other laws to have been made under such section; and

(2) to private nonprofit corporations and associations for the specific purpose of assisting them in providing transportation services meeting the special needs of elderly and handicapped persons for whom mass transportation services planned, designed, and carried out under paragraph (1) are unavailable, insufficient, or inappropriate, with such grants and loans being subject to such terms, conditions, requirements, and provisions (similar insofar as may be appropriate to those applicable to grants and loans under paragraph (1)), as the Secretary may determine to be necessary or appropriate for purposes of this paragraph.

Of the total amount authorized to be appropriated pursuant to section 4(c)(3) of this Act, 2 per centum may be set aside and used exclusively to finance the programs and activities authorized by this subsection (including administrative costs).

3. Section 165(b) of the FAHA, 23 U.S.C. § 142 note (1976), states in its entirety:

(b) The Secretary of Transportation shall require that projects receiving Federal financial assistance under (1) subsection (a) or (c) of section 142 of title 23, United States Code, (2) paragraph (4) of subsection (e) of section 103, title 23, United States Code, or (3) section 147 of the Federal-Aid Highway Act of 1973 shall be planned, designed, constructed, and operated to allow effective utilization by elderly or handicapped persons who, by reason of illness, injury, age, congenital malfunction, or other permanent or temporary incapacity or disability, including those who are nonambulatory wheelchair-bound and those with semiambulatory capabilities, are unable without special facilities or special planning or design to utilize such facilities and services effectively. The Secretary shall not approve any program or project to which this section applies which does not comply with the provisions of this subsection requiring access to public mass transportation facilities, equipment, and services for elderly or handicapped persons.

"satisfactory special efforts." *Id.* The regulations were accompanied by guidelines issued jointly by the Urban Mass Transit Administration and the Federal Highway Administration to illustrate the kinds of plans that would satisfy the "special efforts" requirement. These guidelines allowed each local authority to choose a plan responsive to local needs. For example, a community could provide door-to-door "special services," rather than make fixed-route transportation modes accessible. *Id.*

On April 28, 1976, two days before the regulations were published in their final form, President Ford issued Executive Order Number 11,914, 41 Fed.Reg. 17,871 (1976). The order directed the Department of Health, Education, and Welfare (HEW)[4] to coordinate implementation of section 504 for all federal agencies and departments by establishing standards and guidelines for determining what practices were discriminatory. The President directed other agencies to promulgate regulations consistent with the guidelines established by HEW.

HEW issued its guidelines in 1978. *See* 43 Fed.Reg. 2132 (1978), 45 C.F.R. §§ 85.1–85.58 (1980). They require that all recipients of federal funds "mainstream" handicapped persons, that is, integrate such persons into the same programs available to others, rather than treat them as a separate group in "special" programs. Under the guidelines, "separate treatment" may be provided only when necessary to ensure equal opportunities. *See* 43 Fed.Reg. at 2134.[5]

In the context of public transportation, "mainstreaming" means the physical integration of the handicapped with other members of the travelling public, and the HEW guidelines require that each mode of transportation in a transit system be acces-

sible to the handicapped. *See id.* at 2138–39, 45 C.F.R. §§ 85.56, 85.57. The 1976 DOT regulations clearly violated this requirement; they sanctioned the provision of separate transit services for the handicapped as an alternative to accessible bus and rail systems.

DOT's inconsistent regulations were soon rescinded. Six months after HEW promulgated the guidelines, DOT published its notice of proposed rulemaking, together with proposed rules. *See* 43 Fed.Reg. 25,016 (1976). The notice stated that DOT felt bound by the HEW guidelines to adopt only such options as would constitute "mainstreaming." *Id.* at 25,017. · A regulatory analysis, prepared by DOT to explain its rationale and choices, analyzed the various options in terms of their consistency with the HEW guidelines. *See* Department of Transportation Section 504 Regulation Regulatory Analysis, Joint Appendix (J.A.) at 95. Before publication of the final rules, DOT submitted its draft rules to HEW for approval. Based on discussions with HEW, DOT agreed to a number of changes so that former HEW Secretary Califano could find the DOT regulations in compliance with the HEW guidelines. *See* 44 Fed.Reg. 31,468 (1979).

## B. *The 1979 Regulations*

The new regulations, formally promulgated by DOT in 1979, differ substantially from the earlier ones, although both sets implement the same statutory provisions. The 1979 regulations require that transit systems receiving any federal funds make each mode of public transportation "accessible" to the handicapped by May 31, 1982, although "extraordinarily expensive" structural changes to, or replacements of, exist-

---

4. This opinion uses the designation HEW because it was in effect during the period relevant to these proceedings. This department is now, however, the Department of Health and Human Services. *See* 20 U.S.C. § 3508 (Supp. III 1979).

5. HEW's approach is premised on the principle that "separate but equal" treatment is innately discriminatory and must be avoided to enforce the civil rights guaranteed the handicapped by

section 504. *See* 43 Fed.Reg. 2134 (1978). Mainstreaming has also been advocated in order to prevent the psychological damage such treatment can cause. *See* Miller & Miller, *The Handicapped Child's Civil Right as It Relates to the "Least Restrictive Environment" and Appropriate Mainstreaming,* 54 Ind.L.J. 1, 7 (1978). *See generally* K. Beery, Models for Mainstreaming (1972); B. Gearheart & M. Weishahn, The Handicapped Child in The Regular Classroom (1976).

ing vehicles or facilities may be accomplished over periods as long as thirty years. *See* 44 Fed.Reg. 31,442, 31,477–79 (1979), 49 C.F.R. §§ 27.83–27.95 (1980). Some particularly costly structural changes to rail systems may be waived under certain conditions. *Id.* at 31,480, 49 C.F.R. § 27.99.

A transportation mode is generally considered "accessible" when it can be used by a handicapped person in a wheelchair. Every bus purchased after July 2, 1979, must have a wheelchair lift, *id.* at 31,478, 49 C.F.R. § 27.85. The estimated additional cost is $12,000 to $15,000 per bus.[6] At the end of ten years, half of the buses on any system must be accessible to wheelchair users. *Id.*

Subways and other rail systems must be retrofitted with elevators and "gap-closing" equipment that will enable wheelchair users to board trains. *Id.* at 31,478–79, 49 C.F.R. §§ 27.87–27.89. "Key" subway and commuter rail system stations, about forty per cent of all stations, must be accessible, and connector service must be provided between key stations and other stations. *Id.* At least one car per train must be accessible; to this end, new subway cars acquired after July 2, 1979, must be accessible to wheelchair users, as must new commuter rail cars acquired after January 1, 1983.

The regulations include a special waiver provision for existing subway, commuter rail, and streetcar systems, but not for bus systems. An application for a waiver may be submitted after the metropolitan planning organization, handicapped persons, and their representative groups plan an alternative service that is at least as good as an accessible rail system, and the DOT Secretary has discretionary authority to grant the waiver if these conditions have been met. *Id.* at 31,480, 49 C.F.R. § 27.99.

## C. The Decision Below

DOT's regulations were promulgated on May 31, 1979; on June 29, 1979, the plaintiff, American Public Transit Association (APTA), a voluntary trade association, and eleven of its transit system members,[7] filed suit in district court challenging the validity of the regulations. After hearing argument on cross-motions for summary judgment, the district court entered a judgment affirming the validity of the regulations.

The district court upheld the regulations on the basis of the three statutes cited by DOT: section 16 of the UMTA (local planners must make "special efforts" to provide transportation for the elderly and the handicapped),[8] section 165(b) of the FAHA (transit systems receiving highway funds should be planned, designed, constructed, and operated to allow effective utilization by the elderly and the handicapped),[9] and section 504 of the Rehabilitation Act (no discrimination against qualified handicapped persons in programs receiving federal funds).[10] In addition, the court found that the regulations were supported by DOT's broad power to condition grants to local transit systems under sections 3 and 5 of the UMTA, though these provisions were not cited by DOT in promulgating the regulations.

**6.** At the present time, 80% of this cost is borne by the federal government, but it is under no obligation to continue such subsidies. A change in the level of federal aid would not affect the obligations imposed on local transit systems by these regulations.

**7.** APTA is located in the District of Columbia. The eleven members of APTA who are also plaintiffs in this action are Boise (Idaho) Urban Stages, Brevard (County, Florida) Transportation Authority, Dallas Transit System, Greater Cleveland Regional Transit Authority, Indianapolis Public Transportation Corporation, Kansas City Area Transportation Authority, Port Authority of Allegheny (Pennsylvania) County, Regional (Chicago) Transportation Authority,

Spokane Transit System, Topeka Metropolitan Transit Authority, and Transit Authority of the City of Omaha. All of the appellants other than APTA are public transit agencies or systems. To simplify discussion, all appellants will be referred to collectively as "plaintiff," "appellant," or "APTA."

**8.** *See* text of § 16, quoted in full in note 2 *supra.*

**9.** *See* text of § 165(b), quoted in full in note 3 *supra.*

**10.** *See* text of § 504, quoted in full in note 1 *supra.*

As the district court recognized, to the extent the regulations enforce section 504, they are suspect under *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), a Supreme Court decision interpreting section 504 after the regulations were promulgated. We will first discuss whether the regulations are a valid way of enforcing section 504 of the Rehabilitation Act. Because we conclude that they are not, we then consider whether this court should remand these proceedings to the Department for its reconsideration, rather than determine ourselves the validity of the regulations under other statutes.

## II. SECTION 504 OF THE REHABILITATION ACT

■ Section 504 of the Rehabilitation Act was enacted in 1973 and provides in pertinent part:

No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency ....[11]

The government argues that the DOT regulations at issue in this appeal are within the scope of the Department's power to enforce this provision. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), however, the Supreme Court held that section 504 does not give federal agencies the power to impose such onerous affirmative burdens on local programs.

In *Davis*, a deaf woman applied to Southeastern Community College's registered nurse program. After evaluation of the extent of her handicap by an audiologist, the school rejected her application. The audiologist reported that, even with a hearing aid, Davis would be unable to understand speech directed to her except through lipreading. The school concluded that her deafness would preclude her participation in the clinical portion of the nursing program and that she would not be able to perform effectively as a nurse in a variety of situations. Davis argued that the denial of her application was improper for two reasons. First, the school should not have taken her handicap into account in determining whether she was "otherwise qualified" for admission under the standard of section 504. Second, the school should have restructured the program so that her handicap would not bar her participation.

The Court upheld the validity of the school's action against both challenges. On the first, the Court held that an "otherwise qualified" person is one who is able to meet all program requirements, including necessary physical qualifications, despite his handicap. *Id.* at 406–07, 99 S.Ct. at 2367. In response to the second argument, the Court held that section 504 does not require such substantial program modifications.

In analyzing the second issue, the Court noted that "[t]he language and structure of the Rehabilitation Act of 1973 reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicap." *Id.* at 410, 99 S.Ct. at 2369. The Court concluded that "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative action obligation of all recipients of federal funds." *Id.* at 411, 99 S.Ct. at 2369. In reply to the plaintiff's argument that HEW regulations might put a burden on Southeastern not imposed by the statute itself, the Court responded that if HEW had "attempted to create such an obligation itself, it lack[ed] the authority to do so." *Id.* at 411–12, 99 S.Ct. at 2370.

In holding that section 504 bans discrimination but does not mandate affirmative action to accommodate the handicapped, the Court recognized that the line between impermissible discrimination and optional affirmative action is a fine one. In some situations, "insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped

11. 29 U.S.C. § 794 (Supp. III 1979), quoted in full in note 1 *supra*.

persons of the opportunity to participate in a covered program." *Id.* at 412, 99 S.Ct. at 2370. And failure to take affirmative action might be discriminatory when programs could be opened to the handicapped "without imposing undue financial and administrative burdens upon a State." *Id.*

Applying these standards to public transit, we note that at some point a transit system's refusal to take modest, affirmative steps to accommodate handicapped persons might well violate section 504. But DOT's rules do not mandate only modest expenditures. The regulations require extensive modifications of existing systems and impose extremely heavy financial burdens on local transit authorities.[12] Every new bus or subway car must be accessible to wheelchairs regardless of cost; elevators and other modifications must be added to existing subways. The regulations themselves recognize that some changes will be "extraordinarily expensive"; such changes are nevertheless required, though they may be phased in over periods of time longer than the three-year limit otherwise applicable. *See* 44 Fed.Reg. 31,477 (1979), 49 C.F.R. § 27.83 (1980). These are the kind of burdensome modifications that the *Davis* Court held to be beyond the scope of section 504. Thus, if section 504 and the HEW guidelines are the only underpinnings for the 1979 regulations, their validity cannot be sustained.

### III. THE NEED FOR A PROPER STATUTORY BASIS

As we explain below, we believe that the primary reason DOT rescinded the newly

promulgated 1976 regulations and replaced them with the regulations at issue in this appeal was the perceived need to follow HEW's section 504 guidelines. Every aspect of the rulemaking procedure points to those guidelines as the moving force for change, and, in light of the Supreme Court's decision in *Davis*, section 504 cannot support so burdensome a mandate to local governments. It remains possible, however, that the regulations are a valid exercise of DOT's authority to enforce other provisions of the UMTA and the FAHA; two such provisions were actually cited by DOT in promulgating these rules. We must therefore determine whether the error in relying on section 504 warrants our remanding these proceedings to DOT, rather than considering the validity of the regulations under other statutes.

 When an administrative decision is based on inadequate or improper grounds, a reviewing court may not presume that the administrator would have made the same decision on other, valid grounds. *See, e. g., SEC v. Chenery Corp. (II),* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *SEC v. Chenery Corp. (I),* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). As Judge Leventhal noted in *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 780–83 (2d Cir. 1972) (Leventhal, J., sitting by designation), this rule is necessary to preserve the proper allocation of responsibilities between administrators and reviewing courts. A court usurps the position of the proper decisionmaker when it "rummages throughout the record," *id.* at 783, to find

---

**12.** Estimates of the cost of the program vary widely, but the costs are clearly very substantial. DOT suggests that local authorities will pay $460 million over 30 years. APTA estimates that figure at over $4.5 billion during the same period. These estimates are based on continued federal subsidies of 80% of program cost. There is, of course, no guarantee that such subsidies will continue, and local authorities could become responsible for the total program cost. DOT puts that cost at $3.2 billion; the Congressional Budget Office (CBO) estimates total cost at $7.1 billion. *See* J.A. at 315.

DOT's figures are almost certainly too low because they include only the incremental cost of this program over that of the Transbus pro-

gram, which was to be in effect by September 30, 1979. *See* 42 Fed.Reg. 48,339 (1977) (original Transbus regulation). Under the Transbus program, new full-size buses would be required to conform to DOT's Transbus concept, a low bus easily accessible to persons in wheelchairs via a ramp. Because the Transbus program currently has no effective date, *see* 44 Fed.Reg. 47,344 (1979), 49 C.F.R. § 609.15 (1980), the cost of the regulations before us cannot be calculated in terms of their incremental cost over that of the Transbus program. CBO predicts that the *total* cost of the *bus* portion of the program will be $4.9 billion, as opposed to DOT's $2 billion estimate for the *incremental* cost of the *bus* portion. *See* J.A. at 315.

an alternative basis for the administrator's action: "a court, if it sustains a decision by recourse to reasons outside those specified, opens the door to the improper substituting of the court's judgment and evaluation . . . in place of that of the agency . . . with responsibility." *Id.* at 781.

■ The government argues that a remand is not necessary in this case for two reasons. First, it maintains that the *Chenery* principle applies only when courts would have to advance alternative factual or policy bases for an agency decision, questions that Congress left to agency discretion. The government maintains that *Chenery* does not apply when the administrator errs in interpreting a statute. The rule is, however, fully applicable to such cases. As the Supreme Court held in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), a reviewing court must always determine whether an administrator properly construed the scope of his statutory authority in making a decision. When it is likely an administrator would not have enforced one statute in the way he enforced another, a decision promulgated on the basis of the wrong statute should be remanded for his reconsideration.

■ Second, the government argues, and the court below held, that the DOT regulations are valid because they are based on an independent decision of the DOT Secretary to enforce section 16 of the UMTA and section 165(b) of the FAHA, and to exercise his broad authority to condition grants under sections 3 and 5 of the UMTA. It is true that DOT cited two of these provisions, UMTA section 16 and FAHA section 165(b), in promulgating the regulations, but a court's obligation under *Chenery* to give agencies the opportunity to exercise their discretion unfettered by legal error cannot be avoided by relying on the formal citation of additional authority. Instead, this court must determine whether it is likely that DOT's decision to promulgate these regulations was affected by its mistaken reliance on section 504 and the HEW guidelines. *See Massachusetts Trustees v. United States,* 377 U.S. 235, 247–48, 84 S.Ct. 1236, 1244–45, 12 L.Ed.2d 268 (1964).

■ In 1976, the DOT Secretary promulgated regulations implementing section 504 of the Rehabilitation Act, UMTA section 16, and FAHA section 165. Those regulations did not mandate "mainstreaming" in all transportation modes in all transit systems; rather, they provide that each local authority could make transportation services available to the needy in the manner most suited to its particular situation, and they gave examples of several approaches that would satisfy the regulations. *See* 41 Fed.Reg. 18,234 (1976). If the HEW Secretary had not implemented guidelines enforcing section 504 inconsistent with DOT's 1976 regulations, it is quite possible the latter would still be in effect.

Moreover, in deciding what regulations to implement in 1979, DOT stated that it was bound by the HEW guidelines and evaluated alternatives in terms of their consistency with the guidelines. *See, e. g.,* Department of Transportation Section 504 Regulation Analysis, J.A. at 95, 98 ("[R]eliance on special service transit in place of mainline accessibility would not be consistent with the HEW guidelines. Consequently, this analysis of the section 504 requirements for UMTA grantees is based on the view that mainline accessibility is necessary."); Implementation of Section 504 of the Rehabilitation Act of 1973 by the Department of Transportation, J.A. at 196, 197 (DOT document) ("HEW's Guidelines, are, in our view, legally binding on DOT . . . .").

Furthermore, as discussed above, the DOT regulations were not even promulgated until, after weeks of negotiation and several modifications, the HEW Secretary approved them as consistent with the HEW guidelines. *See* 44 Fed.Reg. 31,442 (1979). Even the formal promulgation of the regulations explains them in terms of the HEW guidelines enforcing section 504. *See id.* at 31,442. In the context of rail systems, DOT explicitly rejected some options because they were inconsistent with the HEW guidelines. *See* 44 Fed.Reg. 31,450 (1979) ("The concept of local option as expressed by many commenters is inconsistent with the assurance of providing program accessibility which section 504 and the HEW

guidelines require."). Although no such statement was made in the context of bus systems, subsequent requests for exemptions for such systems have been rejected on the ground that a waiver would be inconsistent with HEW's guidelines. *See, e. g.,* J.A. at 189, 190 (DOT letter rejecting Erie, Pa., request for waiver for bus system: "[B]inding guidelines issued by [HEW] .... explicitly require that new transit buses purchased with federal grants be accessible.").

We do not hold that, because the Secretary of DOT followed HEW's section 504 guidelines, he could not have made an independent policy decision to take the same approach in enforcing other statutes. We merely hold that the events surrounding the adoption of the 1979 regulations strongly suggest that he did not do so, and it would be improper for this court to "rummage" through the record to resolve a question—whether the regulations enforce other statutes—that should be made by the Secretary in the first instance.[13]

We therefore remand to give the administrator an opportunity to explain whether these regulations are based on statutes other than section 504. If, on remand from the district court, the Secretary indicates that the regulations do enforce other statutes, he should identify the provisions of the UMTA or the FAHA—or any other act—that are enforced by the regulations, and he should justify the regulations in terms of the cited provisions.[14]

## CONCLUSION

We find that the regulations challenged here exceed DOT's authority to enforce sec-

tion 504 of the Rehabilitation Act. Because DOT relied so heavily on the perceived need to enforce section 504 in the manner prescribed by the Secretary of HEW, this case must be remanded to DOT so that it can indicate whether these regulations are also based on some other statutory authority. The decision of the court below is therefore reversed, and we remand to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in the result. A difficult question would be presented in this case if the Department had maintained that section 504 of the Rehabilitation Act, without consideration of any other statutory provision, provided sufficient authority for the issuance of the challenged regulations. This was the position of the Department in the trial before the District Court, and also in its brief to this court on appeal. However, it was my impression from oral argument that DOT no longer advances this position, and instead argues, as the District Court held below, that the regulations are authorized by various provisions of the Urban Mass Transportation Act, possibly in conjunction with section 504. Since in issuing the regulations the Department did not contend to be acting under the authority of UMTA, as it does now, I believe that under *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), a remand to the Department is necessary.

---

**13.** Plaintiff's complaint named both DOT and HEW as defendants. The district court dismissed the complaint as to HEW on the ground that it failed to state a claim on which relief could be granted. Because of our disposition of this appeal, we need not address the propriety of that dismissal or the validity of HEW's guidelines. We have held that the DOT regulations are not a permissible means of enforcing section 504. The fact that the DOT regulations are consistent with the HEW guidelines neither adds to, nor subtracts from, their invalidity, and we express no opinion regarding the general validity of HEW's guidelines. This decision does not, in any way, affect the propriety of

naming HEW as a defendant in any future proceedings challenging the regulations.

**14.** We note that the Presidential Task Force on Regulatory Relief has included both the regulations at issue in this appeal and the HEW guidelines in its list of regulations scheduled for review and possible modification pursuant to Executive Order Number 12,291, 46 Fed.Reg. 13,193 (1981). *See* Motion of Appellees for Leave to Advise Court of Status of Certain Regulations (Apr. 16, 1981). Our disposition of this appeal does not limit or restrain that process.

At the start of oral argument, Government counsel did not seek to justify the regulations under section 504 alone; rather, she asserted that the regulations were "promulgated pursuant to two transportation statutes and section 504 of the Rehabilitation Act." Government counsel then argued that the DOT regulations represented "a permissible [policy] choice under the language of the statutes and *their* legislative history." What is noteworthy is that, although the regulations were in fact promulgated solely on the authority of section 504, at oral argument Government counsel seemed to urge that the regulations were justified on the authority of the three statutes *together*, not section 504 alone.

It is of course possible to construe Government counsel's argument to mean that each of the three statutes provided an *independent* basis justifying the regulations. However, since the Government appears to embrace the opinion of the District Court, I find this suggestion untenable. Furthermore, almost the entire argument of Government counsel was devoted to a justification of the regulations under UMTA. At the very close of her argument, Government counsel stated that:

> [Section] 504 alone could support these regulations, but this court need not reach that issue; it could find as the District Court did that ... the Urban Mass Transportation Act and the Federal Aid to Highway Act independently authorized the regulations.

This was the only occasion during oral argument when Government counsel even suggested that section 504 provided an independent basis justifying the regulations. Following this statement, Government counsel again argued that all three statutes were relied upon to support the regulations. At best, the Government's position is ambiguous. For this reason alone it seems to me that it makes good sense to remand this case for a clearer explication of the Government's position.

Since I agree with the majority that the regulations were promulgated solely under section 504, and since the Government now seeks to argue otherwise, I agree that the case should be remanded.

As a result, I express no opinion here on the extremely complicated question of whether the regulations exceed the permissible scope of section 504 of the Rehabilitation Act by imposing on transit authorities a requirement of "affirmative action," as opposed to one of "non-discrimination." In my opinion, the application of section 504 to public transportation systems raises some questions that are significantly different from those considered by the Supreme Court in the higher education setting in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In considering the accessibility of public transportation to otherwise qualified handicapped persons, it is much more difficult to avoid "discrimination" without taking some kind of "affirmative action." Resolution of the type of permissible affirmative action that may be ordered by the Government as a condition to the grant of federal funds should be made, in my opinion, on a proper administrative record, which sets forth unequivocally the statutory authority and the factual basis for the action taken.