**EASTERN PARALYZED VETERANS ASSOCIATION OF PENNSYLVANIA, INC., et al.**

v.

**Dudley R. SYKES, Commissioner, Philadelphia Department of Public Property, City of Philadelphia, and Southeastern Pennsylvania Transportation Authority.**

Civ. A. No. 86-6797.

United States District Court, E.D. Pennsylvania.

June 30, 1988.

Harvey Bartle, III, Peter Weidman, Teri S. Appelson, Dechert Price & Rhoads, Philadelphia, Pa., for Southeastern Pennsylvania Transp. Authority.

James D. Fornari, Richard M. Zuckerman, Jarblum, Solomon, & Fornari, P.C., Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs and the class.

Susan Shinkman, Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

## MEMORANDUM

NEWCOMER, District Judge.

This litigation focuses on the use of federal funds by the City of Philadelphia ("the City") and the South Eastern Pennsylvania Transportation Authority ("SEPTA") for the renovation of various subway stations and whether or not the plaintiffs, an organization of wheelchair-bound individuals and its members, are discriminated against by the renovations in violation of various federal statutes and regulations.

Presently before the court is SEPTA's motion and accompanying memoranda for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) or, in the alternative, for summary judgment pursuant to Fed.R. Civ.P. 56. Plaintiffs have filed memoranda opposing SEPTA's motion. After considering the parties' arguments, the complaint, and the applicable legal standards, I have concluded that SEPTA's motion should be denied. My reasoning follows.

### I.

Such analysis must begin with plaintiff's amended complaint. The amended complaint alleges that the City and SEPTA have failed and continue to fail to comply with federal statutes and regulations which require that transit facilities be made accessible to the handicapped when such transit facilities are renovated. Plaintiffs claim that the defendants' renovation of the Philadelphia subway system violates section 504 of the Rehabilitation Act of 1973, *as amended,* 29 U.S.C.A. § 794, the Architectural Barriers Act of 1968, *as amended,* 42 U.S.C.A. §§ 4151–4157, sec-

tion 16(a) of the Urban Mass Transportation Act, as amended by section 317(c) of the Surface Transportation Act of 1982, 49 U.S.C.A.App. § 1612(a), (d), section 165 of the Federal–Aid Highway Act, 23 U.S.C.A. § 142 note, and the regulations promulgated pursuant to those statutes.

On a previous occasion this court reviewed the interplay among the various statutes, regulations, judicial decisions, and agency pronouncements implicated in this action. *Eastern Paralyzed Veterans Ass'n. of Pennsylvania v. Sykes,* 676 F.Supp. 597 (E.D.Pa.1987). As SEPTA has not challenged this prior analysis and my own independent review of the statutes and regulations confirms this prior analysis, I see no reason to recapitulate it here. *See also Disabled in Action of Pennsylvania v. Sykes,* 833 F.2d 1113 (3d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988).

### II.

In support of its motion for judgment on the pleadings SEPTA advances four arguments: (1) section 504 of the Rehabilitation Act does not afford plaintiffs a private right of action and that plaintiffs' complaint must be governed by the Architectural Barriers Act and section 502 of the Rehabilitation Act; (2) the Architectural Barriers Act does not provide an *independent* private right of action and that therefore plaintiffs must first exhaust their administrative remedies under the Architectural Barriers Act and section 502 of the Rehabilitation Act; (3) section 165(b) of the Federal–Aid Highways Act does not provide a cause of action; and (4) section 16 of the Urban Mass Transportation Act does not provide a private cause of action.

### A.

■ SEPTA's first argument fails—and with it SEPTA's motion for judgment on the pleadings—because section 504 of the Rehabilitation Act[1] does afford a private

---

1. No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the partic-

ipation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity

right of action to handicapped persons who are discriminated in some manner under a program which receives federal financial assistance. In *Disabled in Action v. Sykes,* the Third Circuit Court of Appeals reviewed this court's decision in a parallel lawsuit. 833 F.2d 1113 (3d Cir.1987). The plaintiffs in that litigation based their complaint on section 504 of the Rehabilitation Act, section 16(a) of the Urban Mass Transportation Act, section 165 of the Federal Aid Highways Act, the regulations promulgated pursuant to those statutes, and 42 U.S.C.A. § 1983. The Third Circuit expressly stated:

> Section 504 affords a private right of action to handicapped persons who are excluded from federally funded programs. [string citation omitted.]

> The plaintiffs also claimed that the defendants had violated section 165 of the Federal–Aid Highways Act, 23 U.S.C. § 142 note, section 16(a) of the Urban Mass Transportation Act, as amended by section 317(c) of the Surface Transportation Assistance Act of 1982, 49 U.S.C. § 1612(a), (d), the regulations applicable to these statutes, and 42 U.S.C. § 1983. We need not reach those contentions in light of our disposition under Section 504 of the Rehabilitation Act.

833 F.2d at 1116 n. 5. Accordingly, plaintiffs may prosecute their complaint pursuant to section 504 of the Rehabilitation Act.[2]

### B.

The second prong of SEPTA's first argument—that plaintiffs must proceed under the Architectural Barriers Act and section 502 of the Rehabilitation Act—also fails. Simply stated, in light of the recognition that section 504 of the Rehabilitation Act provides a private cause of action and the fact that Congress has not empowered the Architectural and Transportation Barriers Compliance Board ("ATBCB") "to make final determinations with regard to compliance with section 504 of [the Rehabilitation Act] regarding architectual ... barriers confronting handicapped individuals,"[3] plaintiffs should not be limited to proceeding only under the Architectural Barriers Act, section 502 of the Rehabilitation Act and the regulations promulgated thereunder.

To begin with, the regulations which lie at the heart of this case, 49 C.F.R. §§ 27.-61–27.67 (1979) (collectively referred to as "Subpart C"), were promulgated pursuant to section 504 of the Rehabilitation Act, sections 3, 5, and 16 of the Urban Mass Transportation Act, and section 165(b) of the Federal–Aid Highway Act. 44 Fed. Reg. 31443, 31468 (1979); 46 Fed.Reg. 37488, 37492 (1981). It is equally clear that Subpart C reflects the requirements found in the Architectural Barriers Act and the regulations promulgated thereunder. 44 Fed.Reg. 31442, 31450[4]; *see also* the Department of Transportation's *amicus curiae* brief at pp. 12–13 n. 9. The Third Circuit has also noted the close relationship between Subpart C and the regulations adopted pursuant to the Architectural Barriers Act.

conducted by any Executive agency or by the United States Postal Service. 29 U.S.C.A. § 794 (West Supp.1988). The Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 29, defines the terms "program or activity."

2. The legislative history of the Rehabilitation Act reveals that one of its goals was the elimination of architectural barriers. S.Rep. No. 318, 93d Cong., 1st, Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 2076, 2078; *see also Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

3. H.Conf.Rep. No. 1780, 95th Cong., 2nd Sess. 90, 91, *reprinted in* 1978 U.S.Code Cong. & Admin. News, 7312, 7401.

4. In providing an analysis of 49 C.F.R. Part 27 (1979), the Department of Transportation stated:

> The Department's section 504 regulation does not supersede GSA's regulation. However, § 27.67 of the section 504 regulation expresses the basic requirement of GSA's regulation, and if a recipient complies with § 27.67, it generally will have satisfied the requirements of the GSA regulation. The Department intends to administer the two regulations as consistently as possible, for we believe that the two are basically consistent.

44 Fed.Reg. at 31450.

848

[T]he Architectural Barriers Act of 1968, as amended, 42 U.S.C. 4151 *et seq.*, ("the Barriers Act") and the regulation promulgated thereunder by the General Services Administration ("GSA"), 41 C.F.R. Subpart 101–19.6, prescribe accessibility standards for the design, construction and alteration of "buildings." [*See* 44 Fed.Reg. 31442, 31450 (1979).] New fixed facilities and alterations to existing fixed facilities which are funded by a grant or loan from the DOT must comply with the GSA regulation. *Id.* The DOT intended that 49 C.F.R. 27.67 reflect the basic requirement of GSA's regulation. 44 Fed.Reg. 31442, 31450 (1979). Therefore, the DOT retained Subpart C's requirement that those portions of mass transportation facilities that are undergoing renovation must be made accessible to the maximum extent feasible. *See* 49 C.F.R. 27.67(b).

833 F.2d at 1118–19 n. 7. As Subpart C reflects the requirements contained in the GSA's regulations, it makes little sense to adopt SEPTA's argument which would require plaintiff to proceed under Architectural Barriers Act and related regulations but prohibit plaintiffs from proceeding under section 504 of the Rehabilitation Act.

Moreover, the opinion of the district court in *Disabled in Action of Pennsylvania v. Pierce*, 606 F.Supp. 310 (E.D.Pa. 1985) ("*Pierce*"), specifically held that a handicapped plaintiff is not limited to proceeding under the Architectural Barriers Act and related regulations. Judge Fullam, after a thorough review of the Rehabilitation Act's legislative history, stated: "[I]t appears that § 504 was intended by Congress to be an independent weapon in its barrier-free arsenal. Nor does defendants' 'specific controls the general' argu-

ment convince me otherwise." 606 F.Supp. at 314 (citing H.Conf.Rep. No. 1750, 95th Cong., 2nd Sess. 90, 91, *reprinted in* 1978 U.S.Code Cong. & Admin.News, 7312, 7375, 7401, 7402). The court also found that the Architectural Barriers Act failed to provide a sufficiently exacting regulatory framework which might preclude relief base on section 504 of the Rehabilitation Act. Judge Fullam concluded:

Hence, in view of the foregoing, and bearing in mind Congress' clearly expressed intent that § 504 be used to eradicate architectual barriers without initial referral to the ATBCB, I see no reason to force plaintiffs to choose one statute over the other. So long as they allege, as they have, that their inaccessibility to HUD activities or programs is the result of improper physical barriers, plaintiffs may maintain an action pursuant to § 504.

*Id.* at 315 (footnotes omitted).[5]

In an effort to minimize Judge Fullam's decision in *Pierce* and support its argument that the plaintiffs must proceed under the Architectural Barriers Act and related regulations, SEPTA has drawn this court's attention to the decision in *Rose v. U.S. Postal Service*, 566 F.Supp. 367 (C.D.Cal. 1983). The district court's decision in *Rose* is of little help to SEPTA. First, the Ninth Circuit Court of Appeals reversed the district court. *Rose*, 774 F.2d 1355 (9th Cir. 1984). Although SEPTA argues that the Ninth Circuit left the district court's ruling on the section 504 issue untouched, a proper reading of the opinion leads to the conclusion that the Ninth Circuit did not affirm the district court on this issue but instead permitted the plaintiffs to pursue their section 504 claims on remand. 774

5. Following Judge Fullam's decision in *Pierce*, the litigants negotiated a settlement. Thereafter, the court denied a petition for attorney fees premised on section 505(b) of the Rehabilitation Act, 29 U.S.C.A. § 794a(b). Disabled in Action appealed this decision. The government argued that its agreement to make the specific building accessible to the handicapped was gratuitous since section 504 and the Uniform Federal Accessibility Standards did not require such a result, and that, therefore, attorney fees were not justified under section 505(b).

The Third Circuit disagreed with the government's arguments and held that the plaintiff was entitled to attorney fees pursuant to section 505(b) of the Rehabilitation Act since the Uniform Federal Accessibility Standards and section 504 of the Rehabilitation Act required the government to do what it had consented to do in its agreement with the plaintiff. *Disabled in Action v. Pierce*, 789 F.2d 1016 (3d Cir.1986).

F.2d 1362–64. Second, the district court's decision in *Rose* did not address the legislative history of the Rehabilitation Act which reveals that Congress expressly rejected a proposal which would have permitted the ATBCB to make final determinations concerning compliance with section 504.

SEPTA has not presented a colorable argument that the plaintiffs here may not proceed under section 504 of the Rehabilitation Act, but, rather, may only proceed in accordance with the Architectural Barriers Act and the regulations adopted thereto.

Since the plaintiffs may prosecute this action pursuant to section 504 of the Rehabilitation Act, this court need not consider SEPTA's arguments that section 16 of the Urban Mass Transportation Act and section 165(b) of the Federal–Aid Highways Act do not provide a private cause of action. Similarly, this court need not consider SEPTA's argument that the Architectural Barriers Act requires plaintiffs to exhaust their administrative remedies before proceeding with an action in federal court. Furthermore, even if this court were to conclude that the plaintiffs must first resort to the administrative mechanism developed under the Architectural Barriers Act and section 502 of the Rehabilitation Act, such a determination would not justify the dismissal of this action at present since plaintiffs claim that the administrative review process has failed to provide a viable means to pursue their complaint lodged with the ATBCB. *See* Affidavit of Terence J. Moakley and Exhibit A thereto, Complaint of Eastern Paralyzed Veterans Association filed with the ATBCB on March 29, 1983.

### III.

In analyzing SEPTA's motion for summary judgment, I turn first to Subpart C, 49 C.F.R. §§ 27.61–27.67 (1981). Subpart C requires that:

Each [new] facility or part of a facility constructed by, on behalf of, or for the use of a recipient [of federal funds] shall be designed, constructed, and operated in a manner so that the facility or part of the facility is accessible to and usable by handicapped persons....

49 C.F.R. § 27.67(a) (1981).

Each facility or part of a facility which is altered by, on behalf of, or for the use of a recipient ... in a manner that affects or could affect the accessibility of the facility or part of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by handicapped persons.

49 C.F.R. 27.67(b) (1981).

Design, construction or alteration of fixed facilities in paragraphs (a) and (b) of this section shall be in accordance with the minimum standards in the "American National Standard Specifications for Making Buildings and Facilities Accessible to, and Usable by, the Physically Handicapped," published by ANSI, Inc. (ANSI A117.1–1961 (R1971)), which is incorporated by reference in this part.

29 C.F.R. 27.67(d) (1981).[6]

Section 5.2 of the 1981 ANSI standard provides in part: "At least one primary entrance to each building shall be usable by individuals in wheelchairs."

The cumulative effects of Subpart C and the incorporated ANSI regulations require that facilities which are altered in a manner that affects or could affect the accessibility of the facility or part thereof shall, to the maximum extent feasible, be altered in accordance with the minimum standards found in the ANSI standards; *i.e.*, at least one primary entrance to each facility shall be usuable by individuals in wheelchairs. 29 C.F.R. §§ 27.67(b), (d) (1981); *Disabled in Action v. Sykes*, 833 F.2d at 1121. The inquiry of whether or not a recipient of federal money has violated 29 C.F.R. §§ 27.61–27.67 must focus on the extent to which the alterations to a facility provided an opportunity to make the facility more accessible and to what degree accessibility,

**6.** This regulation refers to the 1971 ANSI standard and was never amended to incorporate the ANSI standard as revised in 1981.

as defined by the ANSI standards, is "feasible." 29 C.F.R. §§ 27.61–27.67; 833 at 1120–21; 44 Fed.Reg. 31442, 31449.

### A.

SEPTA's first argument in support of its summary judgment motion is that section 504 of the Rehabilitation Act does not require the installation of elevators at the Margaret–Orthodox station. This argument is based primarily on the Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and two of its progeny, *Strathie v. Dept. of Transportation*, 716 F.2d 227 (3d Cir.1983), and *American Public Transit Ass'n v. Lewis*, 655 F.2d 1272 (D.C.Cir.1981) ("APTA").

*Southeastern* did not involve the presence of architectural barriers in a mass transportation system. Rather, the *Southeastern* case concerned a college's rejection of a deaf woman's application to enroll in a registered nurse training program. The unsuccessful applicant brought suit against the college under section 504 of the Rehabilitation Act. The applicant argued that section 504 compelled the college to "undertake affirmative action that would dispense with the need for effective oral communication." 442 U.S. at 407, 99 S.Ct. at 2368, 60 L.Ed.2d at 989. She suggested that the college should have provided her with individual supervision whenever she attended patients and dispensed with certain required nursing courses. *Id.*

The Supreme Court rejected the applicant's arguments and reversed the Fourth Circuit's decision. The Court first analyzed the "otherwise qualified," language which appears in section 504.[7] It determined that the Fourth Circuit's understanding of "otherwise qualified," which included individuals who would be able to meet a program's requirements in every respect *except* as to the limitations imposed by their handicap, was too broad.

> Taken literally, [the Fourth Circuit's] holding would prevent an institution from taking into account any limitation resulting from the handicap, however disabling. It assumes, in effect, that a person need not meet legitimate physical requirements in order to be "otherwise qualified."... An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.

442 U.S. at 406, 99 S.Ct. at 2367, 60 L.Ed.2d at 988. Specific regulations concerning the participation of handicapped individuals in educational programs promulgated by the Department of Health, Education and Welfare also buttressed the Supreme Court's determination.[8] After examining the applicant's limitations,[9] the Court determined that she was not "otherwise qualified" within the meaning of Section 504.

The Supreme Court then examined the question of whether the physical qualifications required by the college were neces-

---

**7.** *See supra,* at n. 1 for the full text of section 504.

**8.** According to these HEW regulations, a qualified handicapped person is, "[w]ith respect to postsecondary and vocational education services, a handicapped person who meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity...." 45 C.F.R. § 84.3(k)(3) (1978). An explanatory note stated: "The term 'technical standards' refers to *all* nonacademic admissions criteria that are essential to participation in the program in question." 45 C.F.R. pt. 84, App A, p. 405 (1978) (emphasis supplied).

45 C.F.R. pt. 84, App A, p. 405 (1978) stated: Paragraph (k) of § 84.3 defines the term 'qualified handicapped person.' Throughout the regulation, this term is used instead of the statutory term 'otherwise qualified handi-

capped person.' The Department believes that the omission of the word 'otherwise' is necessary in order to comport with the intent of the statute because, read literally, 'otherwise' qualified handicapped persons include persons who are qualified except for their handicap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for the job of driving. Clearly, such a result was not intended by Congress. In all other respects, the terms 'qualified' and 'otherwise qualified' are intended to be interchangeable.

**9.** *See* 424 F.Supp. 1341, 1343, 1345 (E.D.N.C. 1976), *quoted in* 442 U.S. at 403, 99 S.Ct. at 2365, 60 L.Ed.2d at 986–87.

sary. 442 U.S. at 407, 99 S.Ct. at 2367, 60 L.Ed.2d at 989. The Court rejected the applicant's affirmative action arguments because such arguments would result in "substantial changes" in the college's program.

> If these regulations were to require substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals, they would do more than clarify the meaning of § 504. Instead, they would constitute an unauthorized extension of the obligations imposed by that statute.
>
> The language and structure of the Rehabilitation Act of 1973 reflect a recognition by Congress of the distinction between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps.

442 U.S. at 410, 99 S.Ct. at 2369, 60 L.Ed.2d at 991.

> Here, neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative action obligation on all recipients of federal funds. Accordingly, we hold that even if HEW has attempted to create such an obligation itself, it lacks the authority to do so.
>
> \*     \*     \*     \*     \*     \*
>
> We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program.

442 U.S. at 411–12, 99 S.Ct. at 2369–70, 60 L.Ed.2d at 991–92 (footnote omitted).

In the wake of *Southeastern,* the Third Circuit had occasion to examine the "otherwise qualified" requirement found in section 504. *Strathie v. Dept. of Transportation,* 716 F.2d 227 (3d Cir.1983). The principal question in *Strathie* was whether Mr.

Strathie—who had been hired and trained as a school bus driver but who also had a hearing impairment which required the use of a hearing aid—was "otherwise qualified" to be a school bus driver. 716 F.2d at 230. The Third Circuit noted that generally an "otherwise qualified" individual is one who could meet all of a program's requirements in spite of his handicap; however, the court also noted that in some instances, where the refusal to modify an existing program to accomodate the handicapped individual would be unreasonable, that individual may be "otherwise qualified" even though he or she cannot meet all of the program's requirements. *Id.* (discussing *Southeastern,* 442 U.S. at 406, 412–13, 99 S.Ct. at 2367, 2370–71). Two factors pertain to the reasonableness of a refusal not to accomodate a handicapped individual. First, requiring accomodation would be unreasonable if it would require the modification of an "essential nature" of the program. *Id.* (discussing 442 U.S. at 410, 413, 99 S.Ct. at 2369, 2371). Second, requiring an accomodation would be unreasonable if it would place undue burdens, such as massive financial costs, on the recipient of federal funds. *Id.* (discussing 442 U.S. at 412, 99 S.Ct. at 2370).

> A handicapped individual who cannot meet all of a program's requirements is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accomodating that individual would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds.

716 F.2d at 231. Although Mr. Strathie—because he needed a hearing aid—could not meet all of the requirements necessary to obtain a school bus driver's license, the Third Circuit ultimately determined that Strathie's proposed accomodations would not require the modification of the essential nature of the Department of Transportation's ("DOT") licensing program.[10]  716 F.2d at 232–34.

---

10. The court did not reach the issue of whether or not the proposed modifications would place an "undue burden" on the Department of Transportation. 716 F.2d at 231 n. 7.

In *APTA*, 655 F.2d 1272, the D.C. Circuit Court of Appeals reviewed specific provisions of 49 C.F.R. Part 27 (1979) ("Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefitting From Federal Financial Assistance"). Following the 1979 promulgation of 49 C.F.R. Part 27, the American Public Transit Association challenged 49 C.F.R. §§ 27.81–27.107 (1979) (collectively referred to as "Subpart E"). Subpart E required transit systems which received federal funds to make each mode of transportation accessible to the handicapped by May 31, 1982. Although the failure to take "modest, affirmative steps" could violate section 504, the court held that, in light of *Southeastern*, because Subpart E required extensive and costly modifications, Subpart E exceeded the DOT's authority to enforce section 504. 655 F.2d at 1278.[11]

SEPTA, relying on *Southeastern, Strathie,* and *APTA,* argues that summary judgment is appropriate because the installation of elevators at the Margaret–Orthodox station would place massive costs on SEPTA's shoulders. SEPTA Memorandum of Law at 33–37. I disagree.

At the outset, I note that the application of section 504 and related HEW regulations in the context of higher education, *see Southeastern,* 442 U.S. 397, 99 S.Ct. 2361, presents questions which differ considerably from the application of section 504 and 49 C.F.R. §§ 27.61–27.67 in the context of public transportation facilities. *See APTA,* 655 F.2d at 1281 (Edwards, J., concurring); *accord Dopico v. Goldschmidt,* 687 F.2d 644, 652–53 (2d Cir.1982).

*Dopico* was decided in the wake of *Southeastern.* In considering a law suit alleging that local and federal transportation officials had not complied with various federal statutes and regulations, the Second Circuit Court of Appeals underscored the fact that the federal government provides large financial subsidies to mass tran-

sit systems on the condition that the recipient abide by federal regulations concerning the provision of transportation services to handicapped individuals. Pursuant to federal regulations, the recipient in *Dopico* was to use $6 million out of a $490 million annual subsidy for projects to assist wheelchair-bound individuals. 687 F.2d at 650. The court stated that, "[w]hile this is a considerable sum of money, it is not 'massive' either in absolute terms or relative to the City's total receipt of mass transportation assistance, particularly since the very receipt of the money was conditioned on such an expenditure." *Id.* The court summarized the distinction between the application of 504 in the educational or employment context, *see Southeastern* and *Strathie,* and the mass transportation context:

> The existing barriers to the participation of the wheelchair-bound are incidental to the design of facilities and the allocation of services, rather than being integral to the nature of public transportation itself, just as a flight of stairs is incidental to a law school's construction but has no bearing on the ability of an otherwise qualified handicapped student to study law.

687 F.2d at 653.

Section 504 requires at least modest, affirmative steps be taken to accomodate the handicapped in public transportation. *Dopico,* 687 F.2d at 652 (citing cases).[12]

■ SEPTA has not established, for the purposes of the present summary judgment motion, that the installation of an elevator at Margaret–Orthodox would require massive expenditures. SEPTA is spending approximately $7.5 million on the renovation of Margaret–Orthodox. Affidavit of Carl F. Dillon, Defendant's Exhibit C, at ¶ 30. Of this $7.5 million, federal funds provide 77% of the total financing (or $5,775,000), state funds provide 17% of the financing (or $1,275,000), and SEPTA's

**11.** The American Public Transit Association did not challenge, nor did the *APTA* decision examine, 49 C.F.R. §§ 27–61–27.67. Following *APTA,* the DOT withdrew Subpart E; however, Subpart C was retained in the regulations. 49 C.F.R. §§ 27.61–27.67 (1981); 46 Fed.Reg. 37488.

**12.** *Cf. APTA,* 655 F.2d at 1278 ("[A]t some point a transit system's refusal to take modest, affirmative steps to accomodate handicapped persons might well violate section 504.").

funds provide 6% of the financing (or $450,-000). *Id.* At SEPTA's request, an organization known as Philadelphia Transit Consultants ("PTC") prepared an analysis and estimate of the costs of installing elevators (the number of which is not specified) at Margaret–Orthodox. According to Mr. Dillon, PTC estimated that the installation of elevators at Margaret–Orthodox would cost approximately $780,000. *Id.* at ¶ 35. Thus, using Mr. Dillon's figures, the cost of the elevators amounts to 10.4% of the total estimated cost for renovating Margaret–Orthodox.[13] Based on the evidence before me, I cannot conclude that the cost of installing escalators at Margaret–Orthodox would constitute a "massive expense." *See Dopico,* 687 F.2d at 650.

In addition, SEPTA "estimates" that requiring the installation of elevators at the twenty-four[14] subway stations on the Market–Frankford line would cost approximately $18,720,000; however, this estimate was reached simply by multiplying the estimated installation cost for the Margaret–Orthodox station by the number of stops on the Market–Frankford line. Even if one were to accept SEPTA's hypothesis,[15] SEPTA has not demonstrated that the estimated aggregate cost would constitute a massive expenditure of the type discussed in *Dopico* and *APTA.* First, SEPTA has an annual operating budget[16] of $535,458,000. SEPTA Statement of Revenue and Expenses for Years Ended June 30, 1987 and 1986, Defendant's Exhibit D. The estimated aggregate cost of elevator installations would amount to approximately 3.5% of SEPTA's operating budget. Second, it is unclear, at present, how the estimated aggregate cost would stack up compared to SEPTA's capital budget. The capital budget may be a relevant benchmark because large-scale projects such as the renovation of subway and elevated stations would appear in the capital budget, not the operating budget. SEPTA has not disclosed the contents of its capital budget. *See* Affidavit of Hal S. Davidow, Defendant's Exhibit D at ¶ 6. Third, it is somewhat misleading to compare the estimated aggregate costs to a budget for a single fiscal year. It would be appropriate to make such a comparison only if *all* of the Market–Frankford line stations were to be renovated within a single fiscal year. Such is not the present case. Rather, this court envisions that the maintenance, repair, and renovations of the Market–Frankford stations will occur over a period of time—very likely over a number of years. Thus, a limited number of stations will be renovated and/or altered in any given year. Also, some stations may not be altered or renovated at all. Therefore, the monies needed to comply with 49 C.F.R. §§ 27.61–27.67 in any given year will be less than the estimated aggregate cost for installing elevators at twenty-four stations. This consideration springs from the fact that the applicable regulations are 49 C.F.R. §§ 27.61–27.67 (1981) and not 49 C.F.R. §§ 27.81–27.107 (1979). Fourth, it appears that the federal government has provided or will provide 77% of the funds necessary to complete the Frankford Elevated Reconstruction Project ("FERP"). Dillon Affidavit at ¶ 17. Up to the present, the federal government has provided at least $40,700,000 for the FERP. The federal government has provided this money,

13. If one were to add the estimated renovation cost ($7.5 million) and the estimated cost for the installation of the elevators ($780,000), one would arrive at the sum of $8,280,000. Using these calculations, the estimated cost for the elevators would amount to 9.4% of the total renovation cost.

14. SEPTA states that three other stations on the Market–Frankford line may be reached by existing elevators. Dillon Affidavit at ¶ 9.

15. SEPTA makes a tenuous assumption to reach the $18.7 million figure it estimates would be needed to install elevators in the twenty-four stations. SEPTA assumes that the estimated installation cost for Margaret–Orthodox would reflect the installation costs at other Market–Frankford stations; however, as each station has a different layout and location the installation costs may vary from station to station. An individualized analysis of each station might well turn up a number which falls below or exceeds SEPTA's estimated aggregate cost.

16. SEPTA's operating budget provides for expenditures involved in the day-to-day running of SEPTA's transit operations, including employee wages and benefits, maintenance of equipment and facilities, and overhead.

and SEPTA has accepted this money, on the condition that SEPTA would comply with Section 504 and related regulations.[17]

It appears to this court that, while the estimated cost for the installation of elevators at Margaret–Orthodox is not negligable, neither is the cost massive, either in absolute terms or relative to the federal money that SEPTA has received for the Margaret–Orthodox renovations. Also, SEPTA has not shown that, as a matter of law, the estimated aggregate cost of installing elevators on the Market–Frankford line would constitute a massive expenditure.

### B.

SEPTA also argues that summary judgment is appropriate because it has complied with 49 C.F.R. §§ 27.61–21.67. SEPTA relies primarily on the *amicus curiae* brief previously filed by the Department of Transportation which argued that subpart C did not require the installation of an elevator. I am unable to agree. First, I have noted that the DOT's argument was not well grounded. *See Eastern Paralyzed*, 676 F.Supp. at 603–604. The DOT's argument failed to take into account the plain meaning of the regulations and the preamble found at 44 Fed.Reg. at 31449. *Id.* Second, in *Disabled in Action v. Sykes*, the Third Circuit held that Subpart C could indeed require the installation of an elevator at a facility which did not previously have an elevator. 833 F.2d at 1120–21.

For the foregoing reasons, SEPTA's motion for judgment on the pleadings or, in the alternative, summary judgment shall be denied.

---

**17.** *See* Plaintiffs' Memorandum of Law in Opposition to SEPTA's Supplemental Summary Judgment Motion; Exhibit C to SEPTA's Application for Mass Transportation Capital Grant, PA–05–0019; *id.* Exhibit D, SEPTA Amendatory Application for Mass Transportation Capital Grant, PA–03–0162–02; *id.* Exhibit G, Urban Mass Transportation Agreement, Part II, Terms and Conditions, Section 118.